DOFT & COMPANY, INC., a New York Corporation, Plaintiff-Appellant,

v.

HOME FEDERAL SAVINGS & LOAN AS-SOCIATION, a United States Corpora-tion, et al., Defendants-Appellees.

No. 76–4068.

United States Court of Appeals, Fifth Circuit.

April 16, 1979.

Daniel S. Pearson, Barnett Robinson, Jr., Miami, Fla., for plaintiff-appellant.

Richard L. Lapidus, Miami, Fla., for Home Federal Sav. & Loan Ass'n.

Thomas G. Schultz, Coral Gables, Fla., for Salvador Rodriguez.

Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.

TUTTLE, Circuit Judge:

This diversity case involves the tort of interference with a business or contractual relationship. Appellant Doft & Co. brought an action against appellee Home Federal Savings & Loan Association, alleging that Home Federal interfered with a broker's contract between the appellant and Hipodromo del Sur, Inc. to arrange financing for a racetrack in Puerto Rico. Appellant alleged that tortious interference by Home Federal caused Hipodromo to terminate its contract with the appellant and resulted in the appellant's loss of its commission under the contract.

The district court entered judgment for Home Federal notwithstanding a jury verdict of $775,000 in compensatory damages for the appellant. The major issue on appeal is the propriety of the judgment notwithstanding the verdict. The appellant also raises points pertaining to the trial court's instructions as to damages, its direction of a verdict for Home Federal on the issue of punitive damages, and its failure to instruct the jury on prejudgment interest.

In passing on a motion for judgment notwithstanding the verdict, we are bound by the familiar principles set forth in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc):

[T]he Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions . . . should not be decided by which side has the better of the case, nor . . . only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and

inferences, and determine the credibility of witnesses.

(footnotes omitted).

Like many jurisdictions, Florida breaks down the tort of intentional interference with a contractual or business relationship into three elements: (1) existence of a business or contractual relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with that relationship by the defendant; and (3) damage to the plaintiff as a result of the breach of the relationship. *Symon v. J. Rolfe Davis, Inc.*, 245 So.2d 278, 280 (Fla.App.1971). The cause of action encompasses interference with both existing and prospective relationships, *Smith v. Ocean State Bank*, 335 So.2d 641 (Fla.App. 1976), and liability results not only from destruction of the relationship, but also from elimination of the injured party's opportunity to perform. *Franklin v. Brown*, 159 So.2d 893 (Fla.App.1964). Moreover, the fact that the plaintiff may have a separate cause of action against one party for breach of contract does not bar a cause of action against any or all of the parties who induce the breach of contract. *Mead Corp. v. Mason*, 191 So.2d 592 (Fla.App.1966).

The evidence in this case is not sufficient to establish the appellant's case under these standards. Although we have reviewed exhaustively all of the evidence in the light most favorable to the appellant, we cannot find any acts by Home Federal that interfered with an existing contractual relationship between Doft & Co. and Hipodromo. Moreover, even if we could find a contractual relationship that was interfered with by Home Federal, there was no evidence of damage to Doft & Co. caused by Home Federal's actions.

The evidence adduced at trial weaves a complex web of facts surrounding the financial arrangement for Hipodromo's proposed racetrack. Doft & Co., a member of the New York and American stock exchanges engaged in investment banking and other financial activities, was approached by the law firm which represented Hipodromo about serving as a financial consultant to arrange backing for the proposed racetrack venture. After a series of meetings between Alan Doft, the president of Doft & Co., and Salvador Rodriguez, Hipodromo's president, Doft & Co. contracted to serve as Hipodromo's agent in arranging this financing. The contract required Doft to raise $15 million for Hipodromo—$10 million in debt and $5 million in equity. In return for arranging the $15 million, Doft was to receive a commission of "5% of the total dollar amount either received by the Company [Hipodromo] or committed to it by Closing." The contract also provided that "for a ten year period, the Company will not engage in any other public or private financing (including further equity issues) without giving . . . [Doft] the right of first refusal."

After entering the brokerage contract in February, 1972, Doft began an extensive search for investors. Rodriguez informed Doft that Home Federal Savings and Loan Association of Hollywood, Florida, might be interested in participating.[1] Negotiations ensued between Doft and Home Federal, and on May 12, 1972, Home Federal issued to Doft & Co. a letter committing Home Federal to lend $10 million to Hipodromo for the racetrack project. The commitment was to expire on July 11, 1972, unless Hipodromo paid Home Federal $50,000 to extend the commitment for another six months. Although Home Federal's knowledge was disputed at trial, we must assume that it knew Doft & Co. was acting as Hipodromo's agent in this particular transaction.

Turning its attention to raising the $5 million equity investment required under the brokerage contract, Doft made numerous inquiries in the financial community and found a willing participant in United States Financial Corp. A meeting was arranged for June 1, 1972, among officials of U.S. Financial, Hipodromo, and Doft &

---

1. It was revealed that Hipodromo had established contact with Home Federal through a Puerto Rico broker, Zoltan Roth, who, in 1971, had unsuccessfully attempted to arrange similar financing for Hipodromo with Home Federal.

Co. The U.S. Financial proposal was not for an equity investment, but was for a very onerous six year loan of $5 million at approximately 40% interest per year, with a $3 million penalty for prepayment within the first year. After this June 1st presentation of the U.S. Financial proposal, Doft began having difficulty reaching the officials of Hipodromo. Finally, Doft received a letter from Rodriguez dated June 21, 1972, in which the Board of Directors of Hipodromo rejected the proposed arrangement with U.S. Financial and threatened Doft with termination of the brokerage agreement within 15 days unless Doft obtained a satisfactory proposal for the $5 million equity investment. Doft made several urgent suggestions of potential investment arrangements, none of which actually complied with the terms of the brokerage contract, but Hipodromo was unwilling to discuss these possibilities at that time.

On June 29, 1972, when Doft was unable to reach the Hipodromo officers, he called Thomas Wohl, president of Home Federal, and requested a thirty-day extension of the July 11th deadline on the commitment. Wohl said that while he was unwilling to give a written extension, he would probably accept the $50,000 even if it was paid after July 11th. During this same conversation, Wohl told Doft that he had recently had a visit from Rodriguez, during which Rodriguez had requested a "copy" of the May 12th commitment letter sent to Doft & Co. Wohl said that he had given Rodriguez a "copy." He did not tell Doft that the "copy" was a newly-typed letter, exactly the same as the original commitment letter except that the "copy" was addressed to Rodriguez as president of Hipodromo, rather than to Doft as agent for Hipodromo. It is conceded that Rodriguez, as president of the principal, had the right to have the commitment letter addressed to him, and there is no indication that any possible misconduct by Wohl in describing the letter as a "copy" without mentioning the change in the addressee affected the contractual relationship between Doft and Hipodromo. Thus, this conduct does not constitute an intentional interference.

On July 7, 1972, after the expiration of the 15-day ultimatum period that Hipodromo had given Doft to produce an acceptable proposal for $5 million in equity financing, Rodriguez paid the $50,000 fee to extend the commitment another six months directly to Home Federal, without advising Doft of this development.

On July 11th, the date the commitment was to have expired, Doft called Wohl to ask again for an extension. Wohl did not tell Doft that Hipodromo had paid the commitment fee, but instead gave Doft some rather curious information. Wohl told Doft that whoever paid the $50,000 would receive the commitment, and when Doft explained that he was Hipodromo's agent and thus only one commitment fee was involved, Wohl replied that Doft had nothing to do with this transaction because Zoltan Roth had brought Hipodromo to Home Federal. Wohl also told Doft that since Rodriguez was expected momentarily with a check for $50,000, Doft's commitment was null and void. Wohl wrote Doft to that effect and sent a copy of the letter to Zoltan Roth.

Wohl's conduct is perplexing. Home Federal, as a lender, had no interest in whether or not a broker was involved in the transaction. Wohl's testimony indicated that his actions were taken in an effort to accommodate Hipodromo; that Rodriguez requested that he change the addressee of the commitment letter so that Hipodromo would have something in exchange for the commitment fee. Wohl also testified that he would not have sent the cancellation letters to Doft and a copy to Roth unless Rodriguez had requested it.

Although Wohl's actions were unfortunate, we feel the situation is distinguishable from the line of Florida intentional interference cases upon which Doft has relied, dealing with real estate brokers. *See, e. g., Franklin v. Brown*, 159 So.2d 893 (Fla.App. 1964). In those cases, the broker typically was given an open listing by the seller of real estate and was entitled to a commission if he produced a purchaser. A prospective purchaser was shown the property by the

broker, but later, the purchaser fraudulently informed the seller that the broker had nothing to do with the transaction, and by such fraud the purchaser succeeded in purchasing the property for some price less the real estate commission that otherwise would have been paid to the broker. Thus, in these cases the purchaser was unjustly enriched at the expense of the broker to the extent of the reduction in purchase price and for this reason, had an interest in excluding the broker. Further, there was clearly an existing contract between the broker and the seller, the purchaser interfered with the contract by fraudulently dealing directly with the seller, and the broker lost a commission that he would have otherwise received had not the tortious acts of the purchaser intervened.

■ In this case, a broker had a contract with a corporation interested in funding a business venture. The broker was entitled to a commission if he produced a financial package consisting of $10 million in debt and $5 million in equity. The broker found a prospective lender for a portion of the financing, but relations between the broker and the borrower broke down. Before the $10 million loan was closed and before the broker found a $5 million equity investor, the borrower unilaterally terminated its contract with the broker and dealt directly with the lender. The lender cooperated with the borrower, but when the broker tried to deal with the lender, it made several misrepresentations to the broker concerning the transaction. The loan was never closed and the broker never completed the financing package. Although the broker lost the commission, this was caused by the borrower's termination of the relationship, not the lender's conduct. There is no evidence that the potential lender was unjustly enriched at the expense of the broker.

Thus, the present appeal is quite different from the real estate brokers cases. In this case, we have difficulty with every element of the cause of action. First, while a contractual relationship once existed between Doft & Co. and Hipodromo, it had greatly deteriorated by the time that the complained of actions occurred. Perhaps the deterioration was caused by Doft's failure to arrange a satisfactory equity issue, perhaps Hipodromo lost confidence in Doft after the onerous U.S. Financial proposal was recommended, or perhaps Hipodromo was concerned that it might have to pay commissions on the Home Federal loan to both Doft and Roth. In any event, something occurred between Doft and Hipodromo, without any apparent intervention by Home Federal, that led the Board of Directors of Hipodromo to give Doft a 15-day ultimatum on June 21, 1972, during which time Doft had to produce an acceptable equity proposal or see his contract terminated. This ultimatum period expired prior to the July 11th actions of Wohl, and while Rodriguez still attempted to cooperate with Doft after that date, the uncontradicted evidence indicates that the contractual relationship between Hipodromo and Doft was undermined by the actions of the Board of Directors of Hipodromo.

Further, even if we found that a contractual or business relationship still existed between Doft and Hipodromo at the time of Wohl's misrepresentations to Doft, we find no substantial evidence that Home Federal's actions interfered with the contract. Although Wohl's conduct may have been confusing to Doft, there is no evidence that it affected the contractual obligations of the parties. Whereas in the real estate broker cases, where the broker has performed his obligations under the contract by producing a purchaser and the interference of the purchaser prevents the broker from receiving his commission by closing the sale directly with the seller, nothing that Home Federal did could have had any affect on Doft's ability to complete his performance under the contract or his right to receive a commission for what he had already done. Not Home Federal's direct dealing with Hipodromo, the issuance of the backdated commitment letter, the misstatements made to Doft, or the cancellation letter sent to Doft and Roth could have interfered with Doft's ability to complete the financial package or his right to receive a commission for the $10 million commit-

ment, if any was due. Wohl's actions simply had no legal affect on Doft's contractual relationship with Hipodromo.

Finally, as to the damage element of this cause of action, Doft has claimed that Home Federal caused the loss of his commission under this contract. Since we have found that Home Federal's actions could not have been the cause of the deterioration of the Doft-Hipodromo contract, those actions could not have caused Doft to lose his commission. Whether the loss of commission was due to Doft's inability to complete the financing package or Hipodromo's unilateral termination of the contract is immaterial to this cause of action. Although Home Federal's handling of the situation may be subject to criticism, at most, it merely added a superfluous blow to an already decomposing contractual relationship.

Since we find that the evidence overwhelmingly points to the conclusion that Home Federal did not interfere with Doft's contractual relations with Hipodromo, we do not reach the issues relating to the trial court's instructions as to damages and direction of a verdict for Home Federal on the issue of punitive damages.

AFFIRMED.