386 So.2d 1220 (1980)
ETHYL CORPORATION, a Foreign Corporation, Appellant,
v.
David BALTER, Appellee.
No. 78-994.
District Court of Appeal of Florida, Third District.
July 8, 1980.
Rehearing Denied September 4, 1980.
*1221 Britton, Cohen, Kaufman, Zinkow, Benson & Schantz and John L. Britton, Fort Lauderdale, for appellant.
Bailey & Dawes and Guy B. Bailey, Jr., Miami, for appellee.
Before HENDRY, HUBBART and SCHWARTZ, JJ.
SCHWARTZ, Judge.
Ethyl Corporation, one of several defendants below, appeals from a final judgment for large amounts of compensatory and punitive damages entered in favor of the plaintiff, David Balter. The judgment was entered on a jury verdict which, in answer to a special interrogatory, found that Ethyl had maliciously interfered with Balter's advantageous business relations. Upon the conclusion that the evidence establishes as a matter of law that Ethyl committed no such tort, we reverse the judgment below and order that one be entered for the appellant instead.
Balter's claims for damages stem ultimately from the loss of his interest in, and employment opportunities with Pac-Craft Corp., a now-defunct Dade County concern, of which he was once the president, chief operating officer, and owner of 50% of the capital stock. Pac-Craft was engaged in the processing and printing of polyethylene film. It obtained the vast majority of its *1222 primary raw material, the film itself, from Ethyl, one of the largest manufacturers of that product in the country. During the late 1960's, Pac-Craft encountered severe financial difficulties which primarily included its inability to pay its outstanding account with Ethyl, by far its largest creditor. As a result, Pac-Craft negotiated a $450,000 loan from the City National Bank of Miami (CNB), which was personally guaranteed both by Balter and Stanley Fromm, the owner of the other half of Pac-Craft, and which was secured by their stock in the company. The only reason the bank agreed to the loan was that Ethyl guaranteed it. Ethyl had decided, rather than forcing Pac-Craft into bankruptcy, instead to attempt to preserve the existence of an important customer in the hopes of receiving a greater return on its outstanding balance and of securing future business as well. In March of 1969, however, Pac-Craft defaulted on the loan. In accordance with the guarantee agreement, the CNB debt was satisfied by Ethyl which was assigned both the pledged Pac-Craft stock and the personal guarantees of Balter and Fromm.
Free now to direct the affairs of Pac-Craft as it wished, Ethyl entered into an agreement with Balter[1] under which he would receive back all of the Pac-Craft stock and be released from his personal guarantee if he were able to effectuate a reorganization of Pac-Craft under Chapter XI of the Bankruptcy Act. In order to comply with this agreement by supplying sufficient funds to achieve a satisfactory Chapter XI plan, Balter entered into a separate contract with a financier named Paul Wolf, who was represented by John Scussel. This agreement called for Wolf to provide $170,000 of partial funding to Pac-Craft in return for making Wolf a director of the company, and granting him the option to purchase 48% of the stock upon Balter's receipt of all the shares from Ethyl. Balter, however, was unable to produce an additional $34,000[2] which was necessary to fund the plan which had been finally approved by the Chapter XI bankruptcy court and by Ethyl and the Pac-Craft creditors' committee which Ethyl dominated as the control creditor.[3] Wolf then withdrew $100,000 of the $170,000 he had deposited with the court, dooming Balter's plan to failure. Subsequently, Wolf, supposedly in order to protect the remaining $70,000 he could not withdraw, himself financed the entire amount necessary to reorganize Pac-Craft. Thereafter, he received all of the stock from Ethyl, which he held until he sold his holdings in 1971. Wolf's plan involved a payment to creditors of some 37% of the outstanding indebtedness. Ethyl thus lost more than $300,000 out-of-pocket in its dealings with Balter and Pac-Craft.
In December, 1969, Balter filed suit against Wolf, alleging a breach of their agreement because of Wolf's withdrawal of the $100,000. Two years later, Balter filed an amended complaint against several more parties-defendant, including Ethyl. The only counts against Ethyl which now concern us alleged (1) a breach of contract, based upon Ethyl's refusal to approve initial plans of reorganization submitted by Balter, which would have required no or substantially less monies to fund, but which would also have brought Ethyl far less return on its outstanding claim; and (2) "malicious interference with contract and with reasonable business expectancies." The latter count was, apparently, primarily based *1223 on an alleged interference with the Balter-Wolf agreement, because of Ethyl's solicitation from others of subsequent and more favorable offers to reorganize. Balter claimed that the submission of such an offer by the Smart-Pac Corp. made it necessary for him to sweeten "his" plan by the additional $34,000 he subsequently was unable to raise. It was thus claimed that Ethyl had thereby become responsible for Wolf's withdrawal of his funds in breach of his contract.
After a three-week trial, the jury found in favor of Ethyl on the breach of contract claim.[4] As to the interference count, however, the jury answered "yes" to a special interrogatory which asked "Do you find that Ethyl Corp. maliciously interfered with the contract or with reasonable business expectations of David Balter, which was a legal cause of loss to David Balter?" Ethyl's appeal results from the judgment entered pursuant to this conclusion.[5]
While Ethyl's attempted interference with the Balter-Wolf contract was apparently the primary tortious act upon which the plaintiff relied below, the trial involved a confusing amalgam of the entire decade-old and immensely complex set of relationships between and among all the parties involved. Our analysis of the massive record on appeal has been hampered by this fact; by the failure of the special verdict to specify precisely with which "contract or ... reasonable business expectations" Ethyl was found guilty of interfering; and even more by Balter's understandable inability to articulate a coherent, consistent theory of liability. Nevertheless, we have carefully reviewed the entire transcript in the light of the applicable law. We find no evidence whatever to sustain the verdict against Ethyl on any basis.[6]
To establish the tort of interference with a contractual or business relationship, it is well-settled in Florida that one must allege and prove (1) the existence of a business relationship under which the plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship by the defendant and (3) damage to the plaintiff as a result of the breach of the business relationship. E.g., Nitzberg v. Zalesky, 370 So.2d 389 (Fla. 3d DCA 1979); Symon v. J. Rolfe Davis, Inc., 245 So.2d 278 (Fla. 1st DCA 1971). Turning first to Ethyl's alleged interference with the Balter-Wolf agreement, the existence of the agreement itself may satisfy the first requisite of the tort. There are any number of reasons, however, why the remaining requirements have not been met. First and foremost, the evidence presented at trial conclusively established  and Balter has admitted  that Ethyl never attempted to interfere directly with the Balter-Wolf relationship, and did not even communicate with Wolf until after he had already withdrawn his $100,000. Thus, there was a total lack of proof of a direct interference with that agreement, which is indispensible to the existence of an actionable wrong. Balter was able to show, at most, that steps taken by Ethyl very indirectly led to Wolf's withdrawal from the arrangement. Even if those acts were not privileged, as we hold infra they were, such conduct simply does not meet the requirements *1224 of the intentional tort of interference. There is no such thing as a cause of action for interference which is only negligently or consequentially effected. 4 Restatement (Second) of Torts § 766 C (1979). See also Hales v. Ashland Oil, Inc., 342 So.2d 984 (Fla. 3d DCA 1977), and cases cited. Furthermore, the only expectations which Balter would even arguably have realized had Wolf not reneged on his agreement were those which flowed solely and directly from Ethyl's own contract to return the stock if a plan of arrangement were consummated. Hence, Ethyl was essentially accused of interfering with its own undertaking to Balter.[7] No such action lies under the law of Florida. See United Yacht Brokers, Inc. v. Gillespie, 377 So.2d 668 (Fla. 1979), and cases cited.
Balter also apparently contends that Ethyl may be held liable because of various pre-Chapter XI actions  including selling Pac-Craft allegedly defective film and "causing" City National to call its loan  which he says "forced" the corporation into reorganization. Again, there are numerous reasons why such claims may not be recognized. Primary among them is the fact that these activities were not directed against Balter or his relationship with Pac-Craft at all, but merely to the corporation itself. While they may or may not have justified an action by Pac-Craft against Ethyl, or a stockholder's derivative action filed by Balter in the name of Pac-Craft, they did not invade Balter's individual rights and therefore cannot form the basis of a tort action by him individually. See, e.g., Alario v. Miller, 354 So.2d 925 (Fla. 2d DCA 1978), and cases cited; Remy Beverages, Inc. v. Myer, 56 N.Y.S.2d 828 (Sup.Ct. 1945), aff'd 269 App.Div. 1013, 59 N.Y.S.2d 371 (1945). In addition, Balter specifically released Ethyl from any such personal claims in return for its release of his $360,000 guarantee on the CNB note Ethyl had satisfied. See Genung v. Loftin, 152 Fla. 759, 13 So.2d 149 (1943); Berry v. Pyrofax Gas Corp., 121 So.2d 447 (Fla. 1st DCA 1960). Finally, a complex and utterly unforeseeable series of events intervened between these actions and Balter's eventual failure to receive the Pac-Craft stock[8]  which would have occurred had Balter only been able to comply with the final reorganization plan which Ethyl had approved and with which it did not interfere. Hence, there was no proximate relationship between the activities in question and Balter's alleged damages. See Doft & Company, Inc. v. Home Federal Savings & Loan Ass'n., 592 F.2d 1361 (5th Cir.1979); Cone v. Inter County Telephone & Telegraph Co., 40 So.2d 148 (Fla. 1949); Seaway Yacht Sales, Inc. v. Brunswick Corp., 242 So.2d 192 (Fla. 3d DCA 1970).
Insofar as the plaintiff separately claims the right to recovery for Ethyl's "interference" with expectations arising from the Balter-CNB-Ethyl loan agreement or the Balter-Ethyl "reorganization" contracts, his contentions also founder upon the principle, to which we have already referred, that a cause of action for interference does not exist against one who is himself a party to the contract allegedly interfered with. E.g., United Yacht Brokers, Inc. v. Gillespie, supra; Paradise Shores Apts., Inc. v. Practical Maintenance Co., 344 So.2d 299 (Fla. 2d DCA 1977); Roberts Co., Inc. v. P.B.O. Ltd., 322 So.2d 633 (Fla. 3d DCA 1975); Days v. Florida East Coast R. Co., 165 So.2d 434 (Fla. 3d DCA 1964); see Berenson v. World Jai-Alai, Inc., 374 So.2d 35 (Fla. 3d DCA 1979).
There is, moreover, a completely separate, additional, and overriding reason which precludes Ethyl's liability for "interference" with any of the various contracts and relationships cited by Balter. Ethyl was, as a matter of law, privileged to act as it did throughout the entire course of events involved in this case. At all times, its actions were reasonably directed to the recovery of the very substantial sums it was owed by Pac-Craft, to the protection of its status as the co-obligor with the corporation *1225 on a $450,000 loan it was later required to pay, and, finally, as the lawful holder of 100% of its stock. Nitzberg v. Zalesky, supra, and Babson Bros. Co. v. Allison, 337 So.2d 848 (Fla. 1st DCA 1976), cert. denied, 348 So.2d 944 (Fla. 1977), among many other authorities, establish the principle that, so long as improper means are not employed,[9] activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable. See also, e.g., Coronet Development Co. v. F.S.W., Inc., 379 Mich. 302, 150 N.W.2d 809 (1967); Petit v. Cuneo, 290 Ill. App. 16, 7 N.E.2d 774 (1937); accord, 4 Restatement (Second) of Torts, § 769, comment c (1979); cf. Matter of Kearney Chemicals, Inc., 468 F. Supp. 1107 (D.Del. 1979).
It is also clear, contrary to Balter's position here, that it is irrelevant whether the person who takes authorized steps to protect his own interests does so while also harboring some personal malice or ill-will towards the plaintiff  that is, in this context, that Ethyl's employees, while attempting to protect its economic situation, also may have happened to dislike Balter personally.[10] In Chipley v. Atkinson, 23 Fla. 206, 1 So. 934, 938 (1887) the first Florida decision to recognize the tort of interference, our supreme court squarely so stated:
"Where one does an act which is legal in itself, and violates no right of another person, it is true that the fact that the act is done from malice, or other bad motive towards another, does not give the latter a right of action against the former."
As the court held in the leading case of Beardsley v. Kilmer, 236 N.Y. 80, 140 N.E. 203, 205-206 (1923):
[W]e have a case where the plaintiff is complaining of and seeking redress for injuries caused by an act which is the product of mixed motives some of which are perfectly legitimate. The question is whether his cause of action can successfully rest upon such a foundation. We feel sure it cannot.
* * * * * *
[I]n other jurisdictions in this country and in England the courts in response to a broader and more equitable vision of the interrelated rights of individuals have tended toward the denial of this proposition that it is lawful to perform an otherwise legal act injuring another when there is no excuse for its performance except the malicious purpose of injury. [citing numerous cases]
But as we have pointed out we are compelled to disagree with plaintiff's view that the acts complained of were solely the conception and birth of malicious motives, and when we do this and decide that there were also legitimate purposes the rule seems to be perfectly well established that there is no liability. The question how far one individual shall be restrained from doing acts which are inherently proper out of respect for the rights of others is bound to be a delicate one. The proposition that a man may not dig a well upon his own land or enter upon a lawful business is one to be advanced with considerable caution, and the cases seem firmly to establish the rule that if he digs a well because he really wants the water or starts the business for personal advantage or gain his neighbor is without remedy however much he suffers, and even though the act may also have been tinged with animosity and malice. [e.s.]
There seems to be no authority which holds to the contrary of this proposition. Accord, e.g., Arnold v. Moffitt, 30 R.I. 310, 75 A. *1226 502 (1910); Raycroft v. Tayntor, 68 Vt. 219, 35 A. 53 (1896); cases collected, W. Prosser, Law of Torts § 129 at 943, nn. 93-94 (4th ed. 1971); 30 Am.Jur. Interference §§ 33, 51 (1958); 45 Am.Jur.2d Interference § 23 (1969); Annot., 26 A.L.R.2d 1227, 1259, § 23 (1952). See generally DeMarco v. Publix Supermarkets, Inc., 384 So.2d 1253 (Fla. 1980), affirming and adopting, 360 So.2d 134 (Fla. 3d DCA 1978); Catania v. Eastern Airlines, Inc., 381 So.2d 265, 267 (Fla. 3d DCA 1980).
In support of his contrary position on this issue, Balter relies solely upon an isolated phrase which appears in Nitzberg v. Zalesky, supra, at 370 So.2d 389, and Serafino v. Palm Terrace Apartments, Inc., 343 So.2d 851, 852 (Fla. 2d DCA 1976), to the effect "that a contracting party has a justification or privilege to interfere where necessary to protect that party's own contractual rights provided such interference is without malice." [e.s.] Insofar as the emphasized clause, which is clearly dictum in both cases, may imply that otherwise privileged activity becomes tortious simply if it is accompanied by a malicious disposition, we believe, for the reasons stated, that it is not a correct statement of the law. Hence, to that extent, we recede from that expression in Nitzberg, and disapprove the one in Serafino.
In support of this determination, we note that the out-of-state cases and text authority cited in Serafino  which was in turn, the sole basis for the statement in Nitzberg  deal only with quite different issues from those arising from the economically privileged actions which are involved in this case, as well as in Nitzberg and in Serafino itself. The only Florida case cited on the question in Serafino, Hunter Lyon, Inc. v. Walker, 152 Fla. 61, 11 So.2d 176, 177 (1942) actually holds that "[t]he ultimate issue will be whether the interference charged was done solely through malice or in the lawful protection of defendant's loans." [e.s.] We similarly find in this case that, since it is beyond question that Ethyl acted in the lawful protection of its legitimate interests in receiving the money it was owed and not "solely" out of malice, the personal feelings its employees may have had about Balter make no difference at all.
The record demonstrates that Balter lost his interest in Pac-Craft and that Ethyl had taken various actions over the years which had something to do with that eventual result  but it shows nothing else. There is utterly no evidence that Ethyl committed any actionable wrong, that it engaged in any activity which is or should be recognized by the law of torts as giving rise to an action by Balter to recover damages on his behalf.
We therefore reverse the judgment against Ethyl and remand the cause with directions that judgment be entered in its favor.
Reversed and remanded.
NOTES
[1] Fromm relinquished all interest in his stock in return for the release of his personal guarantee, and was not made a party to this action.
[2] This occurred because, at the last minute, the Pan American Bank of Hialeah refused to lend Balter the money. See Balter v. Pan American Bank of Hialeah, 383 So.2d 256 (Fla. 3d DCA 1980). Balter claimed that this action resulted in part from the failure of his attorney, Robert Frank, timely to supply the documents demanded by the bank as preconditions to the loan. See Balter v. Frank, 386 So.2d 1227 (Fla. 3d DCA 1980) opinion filed this date. Balter claimed that all of these acts, as well as those of Ethyl, Wolf, and Scussel, were wrongful and that all, acting together in a sort of grand conspiracy, were jointly responsible for the loss of "his" company, Pac-Craft.
[3] Pac-Craft owed Ethyl over $500,000, more than 75% of its outstanding indebtedness.
[4] Balter has cross-appealed from the judgment below, arguing, inter alia, his entitlement to a directed verdict on this count. We hold, to the contrary, that the verdict on this issue is completely supported by the evidence and that the other points raised in the cross-appeal likewise present no error.
[5] Wolf was held liable on both breach of contract and interference counts. The jury also found against Scussel on an interference claim. See the companion appeal in Scussel v. Balter, 386 So.2d 1227 (Fla. 3d DCA 1980). It ruled in favor of co-defendant Robert Frank. See note 2, supra, and Balter v. Frank, 386 So.2d 1227 (Fla. 3d DCA 1980). At the conclusion of the plaintiff's case, the trial judge directed a verdict in favor of Pan American Bank of Hialeah. See note 2, supra. We affirmed that action in Balter v. Pan American Bank of Hialeah, 383 So.2d 256 (Fla. 3d DCA 1980).
[6] The result reached by the jury is probably attributable to a clearly erroneous instruction which virtually directed a verdict in Balter's favor. If we did not conclude that judgment must be entered for Ethyl, the charge in question would have required reversal for a new trial.
[7] Which the jury found was not itself breached.
[8] See note 2, supra, and accompanying text.
[9] The record contains no evidence of any such improper or unlawful activity by Ethyl. Compare cases cited, W. Prosser, Law of Torts § 129 at 936-937, nn. 30-35 (4th ed. 1971).
[10] We assume without deciding the correctness of Balter's very dubious position that there was some evidence of such motivation in Ethyl's conduct. It should be noted, however, that the existence of any such "malice" is completely belied by Ethyl's continued willingness, even eagerness, for Balter to continue as the head and owner of Pac-Craft, even when it enjoyed repeated opportunities either to bankrupt the company outright or to take it over itself and thus to freeze him out entirely.