616 So.2d 1070 (1993)
PENINSULA FEDERAL SAVINGS AND LOAN ASSOCIATION, n/k/a Intercontinental Bank, et al., Appellants,
v.
DKH PROPERTIES, LTD., a Florida Limited Partnership, et al., Appellees.
No. 90-2728.
District Court of Appeal of Florida, Third District.
April 6, 1993.
*1072 Shutts & Bowen, Paul, Landy, Beiley & Harper, P.A., and Sam Daniels, Miami, for appellants.
Richard and Richard and Dennis Alan Richard, Laurel W. Marc-Charles and Sydney A. Marks, Miami, for appellees.
Before FERGUSON, JORGENSON and COPE, JJ.

On Motions for Rehearing
COPE, Judge.
On consideration of the motions for rehearing, we withdraw the opinion dated November 24, 1992, and substitute the following opinion:
Peninsula Federal Savings and Loan Association appeals a final judgment against it for damages and denying Peninsula's counterclaim for foreclosure. We reverse.
Peninsula agreed to make a construction loan to its borrower, DKH Properties, Ltd., for the renovation of an office building in downtown Miami. The initial term of the loan was eighteen months. At the end of the eighteen month construction period, the borrower had the right to extend the loan for an additional three-year period, provided that the borrower satisfied certain conditions. This three-year extension period was referred to as the "Mini-Permanent" loan. During the Mini-Permanent period, the office building would be rented to tenants and the borrower would seek long-term financing.
The borrower attempted to invoke its right to extend the loan for the Mini-Permanent period. The lender refused to extend, contending that the borrower had not met the contractual prerequisites for an extension. The borrower sued in contract and in tort, and the lender counterclaimed for foreclosure. From a judgment in favor of the borrower, the lender appeals.
The tort counts must be reversed. The borrower had purchased the office building and real estate from a partnership, OCE.[1] The borrower gave OCE a purchase money first mortgage on the property. The OCE mortgage provided that OCE would subordinate its mortgage to an institutional mortgage for the purpose of rehabilitating the property.
After Peninsula agreed to make the loan for renovation of the property, Peninsula and OCE entered into a subordination agreement. OCE subordinated its mortgage to Peninsula's 3.5 million dollar mortgage. However, OCE did not agree to an open-ended subordination for Peninsula's future advances clause. Instead, the subordination agreement required that OCE consent to future advances in order for the future advances to have priority over the OCE mortgage.
The borrowers contend that by entering into this subordination agreement, Peninsula was guilty of intentional interference with the borrower's contractual relationships with OCE. That is plainly incorrect.
In the present case the contract between the borrower and Peninsula provided, in part, that the borrower would cause "to be executed by all required parties such instruments and documents as Lender and its attorneys shall require to ensure that Lender shall have a valid first-position lien in the amount of the loan [3.5 million dollars]... ." (Emphasis added).[2] Thus the Peninsula-borrower agreement expressly authorized Peninsula to enter into such *1073 agreements as Peninsula deemed necessary to assure that it had a first mortgage lien on the subject property. As OCE was then the holder of a first mortgage on the property, plainly Peninsula was entitled to require execution of a subordination agreement by OCE in order to place Peninsula's 3.5 million dollar loan in first position. Pursuant to these contractual rights, Peninsula and OCE negotiated a subordination agreement satisfactory to Peninsula.
The tort under consideration here is described by the Restatement (Second) of Torts as follows:
§ 766. Intentional Interference with Performance of Contract by Third Person
One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
Restatement (Second) of Torts § 766 (1979) (emphasis added).
Here, the borrower expressly consented to Peninsula's entry into the subordination agreement in such form and content as Peninsula found necessary to assure that it had a first lien position for the loan amount of 3.5 million dollars. As Peninsula took these steps pursuant to the contract with the borrower, this cannot be deemed "interference," nor can it be deemed "improper," and assuredly it was not tortious behavior. See id.; Florida Telephone Corp. v. Essig, 468 So.2d 543, 544 (Fla. 5th DCA 1985); see also Genet Co. v. Annheuser-Busch, Inc., 498 So.2d 683, 684 (Fla. 3d DCA 1986); United of Omaha Life Insurance Co. v. Nob Hill Assoc's, 450 So.2d 536, 539 (Fla. 3d DCA), review dismissed, 458 So.2d 273 (Fla.), review denied, 458 So.2d 274 (Fla. 1984); Ethyl Corp. v. Balter, 386 So.2d 1220, 1224-25 (Fla. 3d DCA 1980), review denied, 392 So.2d 1371 (Fla.), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981); Nitzberg v. Zalesky, 370 So.2d 389, 391-92 (Fla. 3d DCA 1979), receded from in part, Ethyl Corp. v. Balter, 386 So.2d at 1225; Babson Bros. Co. v. Allison, 337 So.2d 848, 850 (Fla. 1st DCA 1976), cert. denied, 348 So.2d 944 (Fla. 1977).[3]
Additionally, the Peninsula-OCE subordination agreement in no way impeded the performance by OCE of OCE's contract with the borrower. The subordination agreement provided that any future advances by Peninsula over and above the 3.5 million dollar level would require the consent of OCE. The borrower contends that under the borrower-OCE agreement, OCE was obligated to grant further subordination for additional costs associated with the building. Assuming that is so, the Peninsula-OCE agreement did not prevent OCE from consenting to future advances or further subordination. In order to establish tort liability it must be shown that there was interference with OCE's ability to perform its contractual obligations under the OCE-borrower contract; here there was none.[4]
The borrower argues that by virtue of the borrower-OCE agreement, OCE was obligated to grant a monetarily unlimited consent to Peninsula's future advances clause. That is not correct.
The OCE-borrower agreement provided:
2. The Mortgagee agrees to subordinate this mortgage and the note secured *1074 hereby to a superior lien to secure a loan from an institutional lender [Peninsula] where such loan is for the purpose of financing the rehabilitation of the property encumbered hereby by the Mortgagor [borrower]. All funds of the institutional lender shall be used for "hard costs" as they relate to the rehabilitation of the property. "Hard costs" are defined as costs for tangible items to be installed in or on the encumbered premises and labor done to the building, plus expenses incurred by the mortgagor [borrower] for reasonable fees paid to architects, engineers, appraisers and leasing agents, interest and points on such financing, real estate taxes and insurance. "Reasonable fees" shall mean the general standard in the community.
(Emphasis added).
OCE had agreed to subordinate only for hard costs associated with rehabilitation of the property. Peninsula's future advances clause contained no such limitation. Peninsula and OCE negotiated a subordination agreement which gave Peninsula what it was entitled to  subordination by OCE to Peninsula's 3.5 million dollar loan. OCE's approval was to be required in the event Peninsula ever desired to make any future advances.[5] This was certainly a permissible solution,[6] and was well within the contractual authority of Peninsula to consummate.[7]
The borrower argues that it may have been able to find another lender to purchase the Peninsula loan and extend further credit to the borrower if the Peninsula-OCE subordination agreement had covered future advances. While that may be so, the contract between the borrower and Peninsula called for Peninsula to enter into a subordination agreement covering the 3.5 million dollar loan. It did not require Peninsula to enter into a subordination agreement covering future advances. In fact, the parties' contract allowed Peninsula the power to decide the form and content of the subordination agreement. Peninsula did not breach a contractual obligation, much less commit an intentional tort, by entering into the subordination agreement with OCE.
There was no issue for the jury. The lender's motion for directed verdict should have been granted on the intentional interference count, as well as the related conspiracy count. See Lake Gateway Motor Inn v. Matt's Sunshine Etc., 361 So.2d 769, 772 (Fla. 4th DCA 1978), cert. denied, 368 So.2d 1370 (Fla. 1979); see also Wackenhut Corp. v. Maimone, 389 So.2d 656 (Fla. 4th DCA 1980), review denied, 411 So.2d 383 (Fla. 1981).
We likewise find no jury issue as to the fraud count. A directed verdict should have been granted on that issue as well.
The lender contends that it was also entitled to a directed verdict on the claims for breach of contract. Based on the evidence contained in the present record, we disagree.
Under the Mortgage Note, as well as the Construction Loan Agreement, the borrower was entitled to extend the term of the note for the additional three-year "Mini-Permanent" period if certain conditions were met. One of those conditions was that "no Event of Default ... has occurred and is continuing on the date such extension period is to commence... ." Under *1075 the Construction Loan Agreement,[8] a monetary event of default would occur should the Borrower "fail to make payment of any sums of money when due ... and such failure shall continue for four (4) consecutive days after notice... ." Insofar as pertinent here, a nonmonetary Event of Default would occur if "Borrower is in breach of its performance of or compliance with any of the covenants, agreements, terms or conditions (other than for the payment of money) contained [in the Construction Loan Agreement] and such breach "shall continue unremedied for a period of twenty (20) days after written notice... ."
In the present case the extension period would have commenced on April 1, 1986. As of that date, it is undisputed that the lender had given the borrower no notice of any breach of its obligations, monetary or otherwise. Consequently, no Event of Default had occurred.
In addition, however, the borrower would be barred from the three-year extension if "an event which with the lapse of time or the giving of notice, or both, would constitute an Event of Default has occurred and is continuing on the date such extension period is to commence... ." The lender contends that two such events had occurred. First, the lender contends that the borrower's real estate taxes on the mortgaged premises were delinquent as of April 1, 1986, contrary to the requirements of the Construction Loan Agreement and the Mortgage Deed and Security Agreement. Second, the lender contends that the borrower had placed another mortgage on the property, contrary to the terms of the Construction Loan Agreement.
We agree with the lender that either such event, if proven, would constitute "an event which with the lapse of time or the giving of notice, or both, would constitute an Event of Default... ." The lender's motion for directed verdict was, however, correctly denied. The record is ambiguous on the question when the admittedly unpaid property taxes were actually due, and thus the record does not establish that the real estate taxes were delinquent on April 1, 1986.[9] Likewise, the record is ambiguous on the question whether the subsequent mortgage loan obtained by borrower was placed on the subject property or some other property, and if on the subject property, whether it was done in violation of the terms of the parties' agreements. Although our reasoning differs from that of the trial court, we conclude that the denial of the motion for directed verdict on these points was correct.
Because after remand this issue is likely to arise again on a more specific factual record, we address the applicable contract principles. The lender testified that when it refused to grant the three-year extension in April, 1986, it did so for three specific reasons.[10] Later, the lender learned of what it contends was a real estate tax delinquency and subsequent impermissible mortgage. The lender asserted that these constituted failures of conditions precedent which excused the lender from any obligation to grant the three-year extension.
The trial court ruled that the lender could not rely on either of the later discovered matters, and could only rely on the three reasons originally given for refusing the extension. The borrower argues that the doctrines of estoppel or waiver support the trial court's decision.
Quoting extensively from Professor Corbin, one court has said:
"It is sometimes said that a promisor who states an insufficient reason for refusing to perform his promise cannot afterwards defend by showing that another and justifying reason existed. This is not correct. If a condition of his duty to *1076 perform did not in fact exist or occur, he was privileged not to perform. That he did not refer to this condition and that he gave bad reasons is not material as long as there has been no change of position in reasonable reliance upon the promisor's disregard of the unperformed condition. An estoppel may arise, preventing the promisor from setting up his otherwise good defense; but his mere omission to mention that defense and his statement of bad reasons are not sufficient to raise an estoppel. * * *
A buyer of land who points out specific defects in title, as his only stated reason for rejecting it and refusing to pay cannot set up other defects as a defense, if those other defects could and would have been cured in time but for the buyer's misleading the seller into thinking that they were regarded as immaterial or were non-existent. The buyer's words and conduct may operate as an estoppel." ... 3 Corbin on Contracts, (1951), § 762, pp. 937-9, 941. .. .
Prof. Corbin further states that:
"In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. * * * The willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.
... .
The ability of the plaintiff to perform the agreed subject of exchange on his own part is a condition precedent that is not excused by a repudiation by the other party, even though that repudiation is based upon another and insufficient ground." ...
4 Corbin (1951) § 978, pp. 924-926 op. cit., supra. .. .
Bertrand v. Jones, 58 N.J. Super. 273, 156 A.2d 161, 167-68 (Ct.App.Div. 1959) (citations omitted; emphasis omitted), cert. denied, 31 N.J. 553, 158 A.2d 452 (1960).[11] Based on the authority just cited, the fact that the lender based its refusal on other grounds did not, without more, give rise to an estoppel or constitute waiver.[12],[13]
The lender next contends that the trial court erred by instructing the jury that the borrower did not have to give written notice of its intention to request the three-year extension, and that the borrower was entitled to communicate its exercise of the three-year extension in any reasonable manner.
In order to obtain the three-year extension, the "Borrower [agreed] to give the Note Holder thirty (30) days notice prior to the commencement of such extension date of its intention to request such extension." The Mortgage Note was made expressly "subject to ... the provisions of the [Construction] Loan Agreement."
*1077 Under the Construction Loan Agreement, "All notices ... shall be in writing. All notices shall be deemed to have been properly given if hand-delivered or sent by telegraph or by U.S. registered or certified mail... ."[14] Consequently, contrary to the conclusion of the trial court, the contracts specified written notice and the method of sending it.[15]
It is also true, however, that "the condition of notice can be eliminated by a voluntary waiver of the promisor, either before or after the time when the notice is due. As a matter of course, the promisor may by his conduct easily become estopped to insist upon the condition of notice." 3A Arthur L. Corbin, Corbin on Contracts § 759, at 513-14 (1960) (footnotes omitted); see Miami Beach Vacations, Inc. v. Wofford, 262 So.2d 683, 684 (Fla. 3d DCA 1972). In this case the borrower testified that there was a meeting in January, 1986 at which time the borrower gave oral notice of exercise of its right to the three-year Mini-Permanent extension. According to the borrower, the lender accepted the oral notice and agreed that the borrower had thereby exercised its right to the Mini-Permanent extension. The borrower also testified that the lender agreed to take the $35,000 extension fee from the borrower's security account at Peninsula, on April 1, 1986. If the jury found that such an agreement was reached (lender disputes it), plainly the condition as to the form of notice would have been waived, and the requirement for payment of the extension fee satisfied.
Alternatively, the borrower contends that at a minimum, oral notice of the intent to exercise was given at that meeting. If that were found to be the fact, then a failure of the lender to object to the form of notice would prevent the lender from relying on any deficiency in the notice to excuse its performance of its obligations. See Miami Beach Vacations, Inc. v. Wofford, 262 So.2d at 684. At the retrial the jury should be instructed accordingly.
The borrower also testified that it sent a letter to the lender in January, 1986 setting forth the borrower's summary of certain agreements reached at the meeting and referring, in part, to "the Mini-Permanent loan which we advised you yesterday we were exercising." The lender says that it never received the letter and that the letter was not sent by registered or certified mail as required by the parties' agreements.
On this point, if the jury finds the letter was actually received by the bank,[16] the notice would be sufficient notwithstanding that the notice was sent by ordinary, rather than certified or registered, mail. We do not think that the use of ordinary, rather than registered or certified, mail is a material deviation from the terms of the contract, so long as the letter was actually received by the bank.[17]See Dugan v. Haige, 54 So.2d 201, 202 (Fla. 1951); Korey *1078 v. Sheff, 3 Mass. App. Ct. 266, 327 N.E.2d 896, 897 (1975).
The lender next contends that the court erred by charging the jury that "If acceptance was communicated by a reasonable means, a valid extension of the terms of the note was formed." The lender objected that the charge would incorrectly inform the jury that the sole issue was notice and that the borrower was entitled to have the three-year extension simply upon communication of its intention to exercise. In reality the borrower had to satisfy other conditions precedent. We agree that the jury charge was misleading and the objection should have been sustained.
The lender argues that the trial court erred by instructing the jury that the borrower did not have to obtain a permanent certificate of occupancy as a prerequisite to exercising the option for the three-year loan extension. On this point the trial court was correct. The parties' agreements provided, in part, "Prior to the Maturity Date, the Borrower shall deliver to the Lender Permanent Certificates of Occupancy... ." The Maturity Date is not a term defined by the parties' agreements. However, an ordinary definition would be "The date at which an obligation, such as the principal of a bond or a note, becomes due." Black's Law Dictionary 883 (5th ed. 1979).
In the present case the borrower was given "an option to extend the term of this Note for an additional period equal to thirty-six (36) months... ." The effect was to extend the maturity date, and thus to extend the deadline for obtaining permanent certificates of occupancy.[18]
The lender argues that the trial court erred by instructing the jurors that the personal guaranties executed by the individual partners "were discharged upon substantial completion of construction." The parties' agreements provided that "Upon conversion of the loan to Mini-Permanent, the loan will then become nonrecourse to the General Partners personally." The agreements also provided that "Completion of construction and repayment of the loan shall be unconditionally guaranteed by the Guarantors."
As the above quoted language indicates, the guarantors remain liable on the construction loan until the conversion of the construction loan to Mini-Permanent. The guarantors[19] rely on contractual language which states that "The Improvements shall be substantially completed on or before the completion date specified in this Commitment."[20] While the language just quoted sets a deadline for completion of certain improvements, it does not treat the subject of the individual guaranties at all. Under the agreements, the events which release the individual guarantors are repayment of the loan or conversion of the loan to Mini-Permanent.[21]
The lender asserts that the trial court erred by excluding evidence that, according *1079 to the lender, showed that materially false financial information had been submitted in connection with the loan. The parties' agreement provided, in part, that "any misinformation or withholding of material information incident thereto, shall at the option of the Lender, void all of Lender's obligations under this Commitment."[22] The borrower argued, and the trial court ruled, that the lender could not offer evidence on matters "that were not issues in April of 1986 and were not the reasons why they refused to go forward with the Mini Perm."[23] As stated earlier in this opinion, the lender was entitled to offer evidence relevant to a material breach of the borrower's obligations. The evidence should not have been excluded.
During the damages phase of the trial, the lender offered as an expert witness Francis Nardozza, a partner in a major accounting firm who directs his firm's South Florida and Caribbean real estate consulting practice, consisting of some twenty-three employees. One of the employees had collected data under Nardozza's supervision to form part of the basis for Nardozza's expert opinion. The trial court ruled that Nardozza's testimony would not be admitted "unless it would be only on some areas where his testimony would be based solely on his own information, on his own investigation and the information that he has himself been able to acquire independently of [the employee's] information or anybody else, his own alone."
The expert's testimony should not have been so limited. Under section 90.704, Florida Statutes (1991), "The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, him at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence." It was permissible for Nardozza to rely on data assembled by an employee under his supervision. Marks v. Marks, 576 So.2d 859, 862 (Fla. 3d DCA 1991). The expert's opinion should not have been excluded.
The lender asserts that it was error for the trial court to instruct the jury that the borrower could recover lost profits, in the absence of evidence of lost profits. After review of the record we agree that there was no competent evidence of lost profits and the lender's objection should have been sustained.
Given that there must be a new trial on the contract issues and damages, we need not reach the issues regarding set-off and remittitur. In view of the reversal of all of the counts sounding in tort, the punitive damage verdict based thereon must be reversed.
The final judgment is reversed as to the tort counts and the punitive damage award and remanded with directions to enter judgment for Peninsula Federal. The final judgment is reversed as to the contract claims and the claim for foreclosure, and remanded for a new trial on those issues.
NOTES
[1] The partners were Old Crown Properties, Inc. and Emepe, N.V.
[2] The commitment letter defines "loan amount" as $3,500,000.

Under the Construction Loan Agreement, "all other instruments and documents relating to the Loan shall be in form and substance satisfactory to the Lender and its counsel."
[3] The decisions frequently analyze the issue in terms of privilege. E.g., Genet Co. v. Annheuser-Busch, Inc., 498 So.2d at 684. On occasion it has been said that interconnected contracts of this general type fall within the rule that a party may not be charged with interference with its own contract. See United of Omaha Life Insurance Co. v. Nob Hill Assoc's, 450 So.2d at 539.
[4] Even if it is assumed arguendo that the Peninsula-OCE agreement created some indirect interference with the OCE-borrower agreement (and we hold that there was no such interference), "such conduct simply does not meet the requirements of the intentional tort of interference. There is no such thing as a cause of action for interference which is only negligently or consequentially effected. 4 Restatement (Second) of Torts § 766C (1979)." Ethyl Corp. v. Balter, 386 So.2d at 1223-24 (citations omitted; emphasis in original).
[5] Peninsula was under no obligation to make any future advances to the borrower. During the drafting process, the parties agreed to insert a future advances clause into the loan documents.
[6] While another alternative may have been to limit the Peninsula future advances clause to "hard costs" for rehabilitation, this would expose Peninsula to the undesirable risk that after making a future advance, OCE might dispute whether the future advance fell within the scope of "hard costs" for rehabilitation of the building, with the risk that if Peninsula was wrong, then Peninsula would lose priority as to that future advance.
[7] The case relied on by the borrower, Wagner v. Nottingham Associates, 464 So.2d 166 (Fla. 3d DCA), review denied, 475 So.2d 696 (Fla. 1985), is not on point. Here, unlike Wagner, Peninsula's actions were squarely within its contractual rights.
[8] The Mortgage Note was expressly made subject to the terms of the Construction Loan Agreement.
[9] See § 197.333, Fla. Stat. (1985) ("Taxes shall become delinquent on April 1 following the year in which they are assessed or immediately after 60 days have expired from the mailing of the original tax notice, whichever is later.").
[10] These were that there had been no proper request for the extension; that the $35,000 fee had not been paid; and that the building was not complete.
[11] Parties to a contract may choose to require that all objections be made by a time certain, failing which they will be barred. See Banco do Brasil, S.A. v. City National Bank of Miami, 609 So.2d 689 (Fla. 3d DCA 1992) (letters of credit), review denied lack of juris., No. 80,902, ___ So.2d ___ (Fla. Mar. 22, 1993). No such provision is in the contract at issue here.
[12] Waiver is "the intentional relinquishment of a known right... ." Fireman's Fund Insurance Co. v. Vogel, 195 So.2d 20, 24 (Fla.2d DCA 1967) (emphasis added); see also Gilman v. Butzloff, 155 Fla. 888, 22 So.2d 263, 265 (1945); Hochman v. Lazarus Homes Corp., 324 So.2d 205, 206 (Fla.3d DCA 1975). The lender testified that it did not know of the asserted nonperformance of these conditions precedent at the time it refused to grant the extension.
[13] We do not preclude borrower from asserting such defenses as it may have with respect to the two events  nonpayment of taxes and placement of subsequent encumbrance on the property. Borrower argues that the lender caused these events to occur and therefore borrower is excused, or the lender is estopped from relying on them. On remand, borrower may offer such matters as it may have by way of defense or avoidance. We express no opinion on the merits of borrower's defenses.
[14] The Agreement went on to say, "Notices given in the manner aforesaid shall be deemed sufficiently served or given, for all purposes under this Agreement, at the time such notice shall be hand-delivered or telegraphed or three (3) days after it has been deposited in any post office or postal box regularly maintained by the United States Government."
[15] But see Korey v. Sheff, 3 Mass. App. Ct. 266, 327 N.E.2d 896, 897 (1975) ("deemed duly given" does not exclude other modes of transmission).
[16] It should be noted that when a party proves they properly addressed, stamped, and mailed a letter, a rebuttable presumption is created that the addressee received the letter. Berwick v. Prudential Property & Casualty Insurance Co., 436 So.2d 239, 240 (Fla. 3d DCA 1983). "Such a presumption requires the trier of fact to assume the existence of the presumed fact unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event the bubble bursts and the existence of the fact is determined without regard to the presumption." Id. (citations omitted); see also Moses v. Bystrom, 489 So.2d 834, 836 (Fla. 3d DCA 1986).
[17] The letter also referred to an agreement by Peninsula to release $35,000 to fund the minipermanent loan fee. If the letter was received by the lender, the lender had a duty to speak if it felt that it had not agreed to release the $35,000 for the funding of the extension fee. The borrower had to be given a fair opportunity to obtain the fee from other sources if Peninsula was not going to agree to use the security account for that purpose.
[18] The borrower had already obtained temporary certificates of occupancy.
[19] Appellees William I. Donner and Alan R. Hecht.
[20] This language is contained in the Commitment Letter. Under the parties' agreements, "The Commitment Letter forms part of, but shall not be deemed merged into and/or extinguished by, this Agreement; in the event of any conflict ... between ... this [construction loan] Agreement and ... the Commitment Letter, the provisions of the Commitment Letter shall in all respects govern and control."
[21] The lender also objected to a jury charge which stated "it is not necessary to execute a separate and subsequent subordination agreement, for the subordination to be effective." As there will no longer be an issue regarding the subordination agreement at retrial, this charge will not be given and further consideration of it here is not needed.

The lender objects that the jury was instructed, with respect to Events of Default, that "no notice of default or opportunities to cure were given to DKH by Peninsula." The objection to that charge should have been sustained. The issue below was whether there had been "an event which with the lapse of time or the giving of notice, or both, would constitute an Event of Default has occurred and is continuing on the date such extension period is to commence... ." Under the quoted clause, notice and an opportunity to cure were irrelevant. Consequently, the instruction was unnecessary and confusing, and should not have been given.
[22] See supra note 20 (Commitment Letter survives and forms part of Construction Loan Agreement).
[23] The borrower also argued that "the prejudicial value of what he is offering outweighs any probative value since it has no probative value because they admit it was not even an issue in 1986."