432 So.2d 142 (1983)
James William PEACOCK, Jr., et ux., Appellants,
v.
GENERAL MOTORS ACCEPTANCE CORPORATION, Appellee.
No. AO-334.
District Court of Appeal of Florida, First District.
May 6, 1983.
Rehearing Denied June 9, 1983.
*143 Melvin Horne of Horne, Rhodes, Jaffry & Horne, Tallahassee, for appellants.
Jean Laramore and A.W. Clark of Laramore & Aye, Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Chief Judge.
James William and Mary Patricia Peacock appeal from a circuit court order dismissing with prejudice their counterclaim against General Motors Acceptance Corporation for damages allegedly sustained by Bill Peacock Chevrolet, Inc., a bankrupt, and by the Peacocks individually as a result of torts committed by GMAC in exercising its asserted rights to reclaim and obtain payment for automobiles purchased by Peacock Chevrolet from the Chevrolet Division of General Motors Corporation. GMAC, the counterclaim defendant and a wholly owned subsidiary of GM, financed Peacock Chevrolet's automobile purchases from GM's Chevrolet Division as well as retail purchases by customers of Peacock Chevrolet. The circuit court dismissed all counts of the amended counterclaim for failure to state a cause of action.
Defending the dismissal of count one, which alleged GMAC's tortious interference with the business relationships between William Peacock and Peacock Chevrolet and between both and GM, GMAC begins with the erroneous premise that GMAC is in such privity with GM, as its wholly owned subsidiary, that GMAC is also in privity with Peacock and Peacock Chevrolet, in effect a party to the franchise agreement GM granted Peacock for dealership rights to be exercised by Peacock Chevrolet. On this premise, GMAC argues that it cannot in law have tortiously interfered with a contract to which GMAC itself was effectively a party. See Babson Bros. Co. v. Allison, 337 So.2d 848 (Fla. 1st DCA 1976); Covert v. Terri Aviation, Inc., 197 So.2d 12 (Fla. 3d DCA 1967).
We reject GMAC's reasoning and hold that GMAC's subsidiary relationship to GM does not in itself negate the possibility of GMAC's having intentionally interfered with Peacock's and Peacock Chevrolet's business relationships with GM. GMAC is a distinct legal entity, and its being a wholly owned subsidiary of GM does not alter that status. See St. Petersburg Sheraton Corporation v. Stuart, 242 So.2d 185, 190 (Fla. 2d DCA 1970). GMAC does not claim, much less has it established, that GM's control is such that GMAC is but an instrumentality of the parent GM. Id. Absent a piercing of the corporate veil, GM could not be held accountable for GMAC's tortious acts. United States v. Dean Van Lines, Inc., 531 F.2d 289 (5th Cir.1976); Marks v. Green, 122 So.2d 491 (Fla. 1st DCA 1960). If GMAC's tortious acts would not ordinarily subject its parent to liability, it can hardly be argued in the same circumstances that GMAC's relationship to GM immunizes GMAC from separate liability on account of tortiously interfering with GM's contracts with third persons.
Neither can we accept GMAC's next argument, to the effect that the counterclaim shows on its face that GMAC is privileged to act as it allegedly did because of *144 rights secured by GMAC's financing agreements with Peacock Chevrolet. GMAC's privilege to protect its contractual interests is not absolute but is instead conditioned upon its employing means that are not improper. Ethyl Corp. v. Balter, 386 So.2d 1220, 1225 (Fla. 3d DCA 1980); Nitzberg v. Zalesky, 370 So.2d 389, 391 (Fla. 3d DCA 1979); Babson Bros. Co. v. Allison, supra, 337 So.2d at 850; RESTATEMENT (SECOND) OF TORTS § 769. Therefore, without undertaking on this record to state definitively where counterclaimants' burden to allege "unjustified" interference ends and where GMAC's burden to allege its "privilege" begins,[1] we conceive that the complaint[2] alleges tortious conduct, motivated by a primary purpose to terminate *145 counterclaimants' relationships with GM, sufficiently to withstand a motion to dismiss. See Heavener Ogier Services v. R.W. Fla. Region, 418 So.2d 1074 (Fla. 5th DCA 1982).[3]See also Feminist Women's Health Center v. Mohammad, 586 F.2d 530, 551 (5th Cir.1978).
We affirm the circuit court's dismissal of the counterclaim's second count, which purports to allege a cause of action for defamation in these terms:
On or about November, 1979, agents and employees of GMAC, with instructions from GMAC, entered onto the business premises of B.P. Chevrolet; and
(a) told employees of B.P. Chevrolet that they had closed the business of B.P. Chevrolet, which was false and untrue,
(b) told customers of B.P. Chevrolet that they had put both Peacock and B.P. Chevrolet out of business, which was false and untrue,
(c) told customers of B.P. Chevrolet to no longer transact business with Peacock or B.P. Chevrolet because of the foregoing, and

*146 (d) told customers of B.P. Chevrolet that there were armed guards on the premises to discourage them from visiting Peacock or B.P. Chevrolet.
The allegations of subparagraphs (c) and (d) allege no defamation. The allegations in subparagraphs (a) and (b) arguably allege defamation, but are plainly contradicted by other allegations, incorporated in that count from the first count alleging tortious interference with a business relationship, that the statements relied on as defamatory were true. Contradictory allegations within a single count neutralize each other and render the count insufficient on its face. Hoopes v. Crane, 56 Fla. 395, 47 So. 992 (1908); Shelton v. Eisemann, 75 Fla. 644, 79 So. 75 (1918); Harry Pepper & Associates, Inc. v. Lasseter, 247 So.2d 736 (Fla. 3d DCA 1971); H. TRAWICK, FLORIDA PRACTICE AND PROCEDURE § 6-7 (1979).
We likewise affirm the circuit court's dismissal of the third counterclaim, which purports to assert William and Mary's damages for mental anguish, detriment to their marriage, and loss of consortium. The allegations do not satisfy either the physical impact requirement of Woodman v. Dever, 367 So.2d 1061 (Fla. 1st DCA 1979) or standards for the extraordinarily outrageous conduct as described in Ford Motor Credit Co. v. Sheehan, 373 So.2d 956, 959 (Fla. 1st DCA 1979).
The order dismissing the counterclaim is REVERSED as to the first count, but AFFIRMED as to the second and third counts.
SHIVERS and WIGGINTON, JJ., concur.
NOTES
[1] Whether the plaintiff must prove lack of justification or the defendant must prove justification is an unsettled issue in Florida. Compare Insurance Field Services v. White & White Inspection, 384 So.2d 303 (Fla. 5th DCA 1980); Fearick v. Smugglers Co., Inc., 379 So.2d 400 (Fla. 2d DCA 1980); International Funding Corp. v. Krasner, 360 So.2d 1156 (Fla. 3d DCA 1978); Smith v. Ocean State Bank, 335 So.2d 641 (Fla. 1st DCA 1976); Symon v. Jay Rolfe Davis, Inc., 245 So.2d 278 (Fla. 4th DCA 1971), cert. den., 249 So.2d 36 (Fla. 1971) (unjustified interference is part of the plaintiff's case) with Wackenhut Corp. v. Maimone, 389 So.2d 656 (Fla. 4th DCA 1980), pet. for rev. den., 411 So.2d 383 (Fla. 1983); Ford Realty v. Lane Wood, Inc., 405 So.2d 222 (Fla. 3d DCA 1981) (justification or privilege is an affirmative defense).
[2] The counterclaim count for tortious interference alleged:

... .
6. This is a claim against GMAC for the tortious, intentional, and unjustified interference with the advantageous business relationship between PEACOCK and BP CHEVROLET and between PEACOCK and the Chevrolet Division of General Motors, causing severe economic damages, as well as mental anguish, to PEACOCK and BP CHEVROLET.
7. The following is a summary of events and acts which GMAC, through their authorized agents and employees, conducted in an intentional, wrongful, and malicious manner with full knowledge of the relationship between PEACOCK and BP CHEVROLET and the relationship between PEACOCK and the Chevrolet Division of General Motors. All acts were done for the sole, unjustified purpose and design to interfere with the business relationships described herein and to put BP CHEVROLET and its individual franchise owner, PEACOCK, out of business and to cause PEACOCK to lose his Chevrolet franchise with the Chevrolet Division of General Motors.
8. At all times material to this action, GMAC had full knowledge of the business relationships that existed between PEACOCK and BP CHEVROLET and between PEACOCK and the Chevrolet Division of General Motors.
9. On or about November 20, 1979, GMAC wrongfully and without good cause instructed its depository bank to stop payment on a check GMAC had issued to BP CHEVROLET. Said check was returned to BP CHEVROLET's depository bank and, as a direct result of GMAC's "stop payment" order, an insufficient amount of money was in BP CHEVROLET's account to cover outstanding checks. BP CHEVROLET had relied on the value of GMAC's check. BP CHEVROLET's checks would have cleared if GMAC had not wrongfully stopped payment on their check.
10. On or about November 21, 1979, GMAC, through its authorized agents and employees, arrived at BP CHEVROLET's place of business. The agents and employees of GMAC wrongfully, and without authorization from any employee of BP CHEVROLET, removed and took into their possession all the keys, titles, and statements of origin from the vehicles belonging to BP CHEVROLET. Many of these vehicles were held in trust for GMAC pursuant to a financing agreement with BP CHEVROLET; however, many of these vehicles were fully owned by BP CHEVROLET and GMAC had no rights or interest in said vehicles. Nevertheless, GMAC wrongfully and illegally took possession of them.
11. On or about the same date, time, and place set forth above, the employees and agents of GMAC, acting under instructions of GMAC, continued their wrongful and illegal acts, intentionally with the malicious and primary purpose of ruining the business of BP CHEVROLET and causing PEACOCK to lose his franchise with the Chevrolet Division of General Motors by committing the following:
(a) employees and agents of GMAC drove the vehicles, which they had wrongfully taken possession of, into the center of all entrances and exists of the business establishment of BP CHEVROLET, effectively closing the business. Customers' vehicles could not enter or leave the business location;
(b) agents and employees of GMAC drove the vehicles, which they had wrongfully taken possession of, in front of the paint shop, body shop, and other drives connecting the business of BP CHEVROLET with the public streets. After the vehicles had been driven by the agents and employees of GMAC to the places aforementioned, the agents and employees of GMAC let the air out of the tires of said vehicles, removed the rotors from the distributors, and locked the vehicles;
(c) agents and employees of GMAC, with instructions from GMAC, harassed the employees of BP CHEVROLET by saying untruthful and demeaning remarks about BP CHEVROLET and by telling the employees that they had closed the business and that the employees of BP CHEVROLET could go home;
(d) agents and employees of GMAC, with instructions from GMAC, harassed customers of BP CHEVROLET by saying untruthful and demeaning remarks about BP CHEVROLET and PEACOCK, and by saying, among other things, that they had put both BP CHEVROLET and PEACOCK out of business and to no longer transact any business with either;
(e) agents and employees of GMAC, with instructions from GMAC, stopped all work of every kind at BP CHEVROLET's place of business, including sales, repairs, paint, and body work;
(f) agents and employees of GMAC, with instructions from GMAC, posted 24-hour guards upon the premises of the BP CHEVROLET. These guards, acting on behalf of GMAC, insulted and degraded customers for coming to BP CHEVROLET to do business, loitered in the offices of BP CHEVROLET, and ransacked the drawers and files of BP CHEVROLET and PEACOCK. They used the telephones to make long distance calls, without paying for the calls, and they took whatever supplies or other materials they wanted. The guards urinated and defecated on the car lot. They drank alcoholic beverages and threw beer cans on the lot at night;
(g) agents and employees of GMAC advised customers of BP CHEVROLET that they had taken over the business and were attempting to find a buyer for BP CHEVROLET and that PEACOCK would not be allowed to run the business any longer.
12. On or about January 21, 1980, BP CHEVROLET filed a Chapter 11 petition for reorganization in the United District Bankruptcy Court. The Bankruptcy Court required GMAC to return possession of all the vehicles they had wrongfully taken possession of in order to allow BP CHEVROLET to reorganize and reestablish its business. However, the wrongful and illegal acts of GMAC could not be corrected to allow a normal continuation of its business, and BP CHEVROLET was adjudicated a bankrupt corporation.
13. During the Chapter 11 proceedings, GMAC continued their wrongful and illegal acts through their agents and employees to do whatever they could to cause the failure of BP CHEVROLET and to cause PEACOCK to lose his Chevrolet Division of General Motors franchise.
14. As a result of GMAC's deliberate, intentional, and unjustified activity outlined herein, the business relationship between PEACOCK and BP CHEVROLET was adversely affected and the business relationship between PEACOCK and the Chevrolet Division of General Motors was destroyed.
15. PEACOCK and BP CHEVROLET suffered severe damages as a result of the willful, wrongful, intentional, unjustified, and malicious acts of GMAC, including, but not limited to, lost profits, injury to reputation, loss of franchise rights, and other consequential damages.
[3] The constituent elements of the tort of tortious interference with a business relationship are (1) an advantageous (2) business relationship (3) under which plaintiff has legal rights, plus (4) an intentional and (5) unjustified (6) interference with that relationship (7) by the defendant (8) causing (9) a breach of that business relationship and (10) consequential damages. 418 So.2d at 1076.