627 So.2d 492 (1993)
GNB, INC., Appellant/Cross-Appellee,
v.
UNITED DANCO BATTERIES, Inc., f/k/a Danco Batteries, Inc., and Daniel K. Pernas, Appellees/Cross-Appellants.
No. 92-00073.
District Court of Appeal of Florida, Second District.
August 27, 1993.
Rehearing Denied December 15, 1993.
Hugh N. Smith and David S. Nelson of Smith & Fuller, Tampa, and Michael E. Barry and Deena S. Newlander of Gardner, Carton & Douglas, Chicago, IL, for appellant/cross-appellee.
A. Lamar Matthews, Jr., Steven D. Hutton, and Martin Garcia of Matthews, Hutton & Eastmoore, Sarasota, for appellees/cross-appellants.
*493 PER CURIAM.
We find competent and substantial evidence in the record to support the jury's award to the appellee Danco on its counterclaim against the appellant GNB for tortious interference with advantageous business relationships. As an appellate court, it is not our function to reweigh the evidence but, rather, to view the record to determine if it contains competent and substantial evidence to support the conclusions of the trier of fact. Because such evidence exists in this case, we affirm. See Star Island Associates v. Lichter, 473 So.2d 791 (Fla. 2d DCA 1985).
While the dissent's explanation of the applicable law is entirely correct, its conclusion that GNB should have been awarded a directed verdict on Danco's counterclaim is based on a view of the evidence different from the view which we believe the jury was entitled to take. The dissent believes there was no evidence to support an essential element of the tort claim; we believe there was such evidence. Resolution of conflicts in the evidence and inferences therefrom was for the jury.
RYDER, A.C.J., and DANAHY, J., concur.
ALTENBERND, J., dissents with opinion.
ALTENBERND, Judge, dissenting.
GNB, a battery manufacturer, sued Danco, a battery wholesaler, for goods sold and delivered prior to December 1988. The jury awarded GNB approximately $370,000 on this claim. This portion of the verdict has not been challenged on appeal. Thus, it is established that Danco owed GNB a sizable debt in 1988 and that GNB was entitled to collect that debt.
For reasons that seem to defy a logical explanation, the jury awarded Danco $1,025,000 on its counterclaim against GNB for tortious interference with advantageous business relationships. The alleged interference occurred while GNB was attempting to collect the outstanding indebtedness. I conclude that the trial court should have granted GNB's posttrial motion for a directed verdict concerning this claim. Accordingly, I would reverse the $753,965 judgment in favor of Danco and remand for entry of a judgment in favor of GNB.

I. INTENTIONAL INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP
The elements of intentional interference with an advantageous business relationship are described in slightly different language in precedent. The elements approved by the supreme court in Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla. 1985), are fourfold: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. Id. at 1127. See also Security Title Guarantee Corp. of Baltimore v. McDill Columbus Corp., 543 So.2d 852 (Fla. 2d DCA 1989); Fort Lauderdale Riverwalk Properties, Inc. v. White, 531 So.2d 739 (Fla. 4th DCA 1988), review denied, 541 So.2d 1173 (Fla. 1989); Wackenhut Corp. v. Maimone, 389 So.2d 656 (Fla. 4th DCA 1980), review denied, 411 So.2d 383 (Fla. 1981); Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla. 3d DCA 1980), review denied, 392 So.2d 1371 (Fla.), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981); Nichols v. MoAmCo Corp., 311 So.2d 750 (Fla. 2d DCA 1975). Cf. Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc., 418 So.2d 1074 (Fla. 5th DCA 1982) (dissecting the tort into ten elements).
In explaining that the interference must truly be intentional and must actually interfere, the courts have frequently emphasized that the interference must be direct. McCurdy v. Collis, 508 So.2d 380 (Fla. 1st DCA), review denied, 518 So.2d 1274 (Fla. 1987); Ethyl Corp.; Lawler v. Wuesthoff Memorial Hosp. Ass'n, 497 So.2d 1261 (Fla. 5th DCA 1986); Rosa v. Florida Coast Bank, 484 So.2d 57 (Fla. 4th DCA 1986). I emphasize this requirement because the extensive record in this case contains little proof that GNB directly contacted or otherwise attempted to directly influence any of Danco's customers or suppliers.
*494 This dissent will focus primarily on the absence of evidence that GNB's actions were unjustified. Justification is a confusing element, and probably a poorly developed aspect, of this tort. It is confusing, in part, because the case law has not clearly determined the line between the plaintiff's burden to plead and prove improper conduct by the defendant, and the defendant's right to plead and prove a qualified privilege of justification as an affirmative defense. See Peacock v. General Motors Acceptance Corp., 432 So.2d 142, 144 (Fla. 1st DCA 1983) (declining to determine where the burden to prove "unjustified" interference ends and the burden to allege "privilege" begins); Heavener, 418 So.2d at 1076 n. 6; Fla.Std.Jury Instr. (Civ.) 7.2 note 3. See also Restatement (Second) of Torts § 767 cmts. j, k (1977); Phillip J. Campanella et al., Interference with Lawful Business, in Business Torts, § 13.04[2] (Joseph D. Zamore ed., 1991). In this case, the jury instructions placed the burden upon Danco to prove that GNB's actions were unjustified. I am inclined to believe that Danco at least had the initial burden to prove that GNB acted solely from malice or used an improper business method. It failed to do so. Even if justification had been regarded as an affirmative defense, I am still inclined to believe that no evidence supported this jury's verdict on the claim of tortious interference.
The concept of justification is also confusing because it is described as a two-prong issue involving both motive and method. Apparently, if a person interferes with an advantageous business relationship solely out of a malicious motive, with no valid business purpose, liability is imposed without regard to the method of interference. See McCurdy, 508 So.2d 380. On the other hand, if a defendant has a valid business purpose, "[t]he unchallengeable controlling principle is that `so long as improper means are not employed, activities taken to safeguard or promote one's own financial ... interests are entirely nonactionable.'" Security Title, 543 So.2d at 855 (quoting from Ethyl Corp., 386 So.2d 1220).
This jury's verdict cannot be based on malicious motive. The evidence established without dispute that GNB's actions were motivated, at least in part, by its good faith belief that Danco owed it a substantial debt. After the jury confirmed that Danco owed GNB several hundred thousand dollars, it became undeniable that GNB had a legally sufficient motivation for its actions because of its right to protect its own financial interests. Thus, in reviewing the record, we must look for proof that GNB utilized an improper business method which directly interfered with Danco's relationships either with its customers or its suppliers.
Improper business methods seem to fall into three distinct categories: (1) acts which are already proscribed by statute, (2) acts which constitute separate independent torts, and (3) other ill-defined "bad" acts.
In this case, Danco has not alleged a statutory violation. There are no claims that GNB violated any of the antitrust provisions in chapter 542, Florida Statutes, or that it violated any other statutory business law. The jury was not instructed on such an option.
Likewise, Danco has not proven a separate independent tort. It is well-established that "physical violence, misrepresentations [to customers or suppliers], illegal conduct or threats of illegal conduct" may constitute improper business methods. Fla.Std.Jury Instr. (Civ.) 7.2. Because these methods are separate independent torts, the interference in such cases is not a distinct theory of liability, but is actually a recognition of additional business damages resulting from the commission of the other intentional tort. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129, at 992 (5th ed. 1984). In this case, I find no proof of these recognized forms of improper methods.
Thus, this case hinges on the third ill-defined category of improper business methods. The Restatement suggests that a determination of improper conduct should involve a consideration of several factors, including the social interests in protecting freedom of action by the defendant and the contractual interests of the plaintiff. Restatement (Second) of Torts § 767 (1977). It recognizes that unlike other intentional torts, tortious interference has not yet developed a "crystallized set of definite rules as to the existence *495 or nonexistence of a privilege to act." Id. at cmt. b.
When established law has not clearly announced the duty owed by defendants, it is important for the judiciary to fulfill its important role in defining the general standard of care owed by all defendants. This is true for intentional torts as well as for negligence. Accordingly, much of the precedent in this area approves or compels directed verdicts in order to limit and define the defendant's standard of care in this tort.[1]
I am convinced that the supreme court rarely intends the concept of improper business methods to be expanded to include acts that are neither independently tortious nor proscribed by statute. In a state that values open competition in a free enterprise economy, tortious interference should not become an amorphous antitrust concept that allows juries to decide on a case-by-case basis whether business practices lawfully permitted by the legislature are good or bad. This narrow tort should protect business enterprises from only exceptional, intentional business practices that clearly involve unjustifiable motive or conduct. See Hunter Lyon, Inc. v. Walker, 152 Fla. 61, 11 So.2d 176 (1943).
I can understand why the trial court reserved ruling on the motion for directed verdict at the close of the evidence in this long trial. As Danco's attorney argued, the issues of tortious interference could not be resolved until the jury determined whether Danco owed money to GNB. If GNB was owed nothing, arguably the jury could have found an improper motive for all of GNB's conduct. See, e.g., Southern Bell Tel. & Tel. Co. v. Roper, 482 So.2d 538 (Fla. 3d DCA 1986) (issue of malice for tortious interference is typically a jury question). However, after the jury found that Danco owed GNB a big debt, the post-trial motion for directed verdict should have been granted. Our decision today does not accord with Tamiami Trail Tours or Ethyl Corp.

II. THE EVIDENCE
The record in this case is lengthy. Unfortunately, I am compelled to summarize the evidence in order to discuss all possible unjustified business methods. Because I conclude that the trial court should have granted a directed verdict, I summarize the evidence in the light most favorable to Danco. I have attempted to assume the truth of many weak inferences, even though I seriously doubt that any reasonable jury would accept them.
Dan Pernas, the majority shareholder of Danco, formed that company in 1975, to distribute batteries on a wholesale basis. In July 1987, Danco began to purchase batteries directly from Pacific Chloride, Inc. (PCI), a large battery manufacturer. These purchases were made under a purchase contract, a security agreement giving PCI a security interest in the batteries, and a personal guaranty signed by Mr. Pernas. In addition to selling wholesale batteries to Danco, PCI also paid Danco to distribute batteries in a "feeder" program to Ace Auto Parts and Tire Kingdom stores. Difficulties arose between PCI and Danco concerning the reconciliation of Danco's account. I assume that these problems arose primarily, if not exclusively, as a result of errors in PCI's bookkeeping.
In February 1988, GNB, a competitor of PCI, acquired substantially all of PCI assets, including the Danco accounts receivable. Shortly thereafter, GNB assigned Gerry Janes to the Danco account, and he visited Mr. Pernas in Tampa. Mr. Pernas explained the problems with PCI's bookkeeping to Mr. Janes, who admitted that PCI's records were in a state of disarray. Mr. Janes suggested that Mr. Pernas focus first on the problems arising from the feeder accounts. At this meeting, Mr. Janes also presented a security agreement to Mr. Pernas, who executed it on February 29, 1988, in favor of GNB. This *496 provided GNB with a security interest in the batteries it sold to Danco.
Although Mr. Pernas and Mr. Janes attempted between February and August to completely reconcile the accounts to the satisfaction of both parties, they were not successful. Mr. Pernas cancelled a meeting scheduled for mid-August 1988 with Mr. Janes in order to meet with Mora Batteries, a Brazilian battery manufacturer, regarding the potential purchase of an interest in Danco. At the meeting, Mora purchased 5% and executed an option to purchase an additional 10% of Danco and two related companies. Upon Mr. Pernas' return to Tampa, he learned that GNB had placed Danco on a credit hold as a result of his cancellation of the GNB meeting. GNB removed the credit hold when Mr. Pernas rescheduled the meeting.
The meeting was finally held on August 22 at Danco's office in Tampa. The focus of the meeting was the PCI account problems. Although nothing regarding the PCI account was resolved, Danco tendered a check for approximately $136,000 to bring the GNB (not PCI) product-account current.[2]
Between August and December 1988, GNB placed Danco on another credit hold because Danco had made payments to GNB with checks that were returned for lack of sufficient funds. Upon clearance of those checks, the credit hold was removed.
Danco's final order from GNB was shipped on September 26, 1988. Unable to resolve the account dispute, Mr. Pernas decided that Danco would begin purchasing at least a portion of its inventory from other manufacturers. Danco made a substantial purchase from Mora, but it discovered that the Brazilian batteries did not meet specifications required in the United States and returned them to Mora.
Danco and GNB had a final meeting on December 1, 1988. GNB sent Mr. Janes' supervisor, Mr. Johnson, to this meeting. GNB still believed Danco owed it over $600,000, after allowing for certain credits.[3] Danco believed that it may owe some amount, but maintained that it was entitled to credits in excess of $700,000. Apparently, Danco's proposed credit was approximately $100,000 higher than its previous estimate of credits. After Mr. Pernas presented this new proposal, Mr. Johnson called him a thief, and the meeting deteriorated. Mr. Janes then stated that GNB would use all of their resources to financially ruin Mr. Pernas. At the conclusion of the meeting, Mr. Pernas asked to discuss the problem with a higher-level executive at GNB. This request was never fulfilled.[4]
After the December meeting, GNB officials discussed the Danco problem with both in-house and Florida counsel and decided to exercise GNB's right to take possession of the collateral. Both the PCI and GNB security agreements with Danco provided that upon default, the secured party had the right to take possession of the collateral without judicial process, if this could be done without a breach of the peace. See § 679.503, Fla. Stat. (1987).
On December 20, 1988, GNB took three actions. First, it sent trucks both to Danco in Tampa and to United Miami to recover batteries as security on the debt owed by Danco.[5] Although technically a customer of Danco, United Miami was a corporation owned and controlled by Mr. Pernas. Mr. Pernas, surprised by GNB's attempt, contacted his attorney who advised him to instruct the GNB representatives to leave the *497 premises unless they had a court order. Upon Mr. Pernas' request, the GNB trucks left without the items. Danco does not argue that this attempted repossession involved violence or physical force. Two days later Danco voluntarily returned the batteries from these two locations and received a credit of approximately $20,000.
Second, GNB filed this lawsuit in Hillsborough County, alleging Danco owed GNB approximately $600,000. The lawsuit made the dispute between the two parties a matter of public record. Given that the jury awarded GNB a substantial verdict, it should be obvious that Danco cannot claim that the lawsuit was improper or malicious.
Third, GNB ceased to supply Danco with batteries. Although Danco had no written contract providing that GNB would give it sixty days' notice of termination, it maintained that it had an oral agreement providing for such notice. Interestingly, there is no evidence that Danco ever attempted to order more batteries from GNB after December 20, 1988.
Word that GNB had attempted to recover its collateral from Danco and that it was suing Danco spread throughout the battery industry. GNB admits that it knew this would happen. After December 20, Mr. Pernas had difficulty in locating a new supplier that would sell products to Danco on credit. When Mr. Pernas contacted Douglas Batteries, with whom he had a $55,000 line of credit and a zero balance, Douglas indicated they had spoken to Mr. Janes and would only sell to Danco if payment was wired prior to shipment. Douglas returned its security agreement and withdrew its UCC filing. The evidence, however, does not establish what Mr. Janes told Douglas.
There is no evidence of any direct contact between GNB and Mora. After Mr. Pernas informed Mora of GNB's attempted repossession, however, Mora declined to exercise its option to purchase an additional interest in Danco. Within six months of the filing of this lawsuit, Danco's largest customers were buying from other distributors. By the end of 1990, Danco was out of business.[6]
To finish this story, one must learn about Southern Battery, another battery retailer. Both GNB and Southern deny any conspiracy to destroy Danco. Because Danco believes that GNB, alone or in conjunction with Southern, planned to replace Danco with Southern, I will describe the allegations and evidence concerning this theory.
In early 1988, Southern, owned by John Smith, decided to expand its Florida operations. Mr. Smith was also the majority owner of Battery Dynamics in Jacksonville and had personally guaranteed its debt with PCI. Battery Dynamics was experiencing financial difficulties and GNB decided to foreclose. As a result, Mr. Smith purchased the assets and paid the debts of Battery Dynamics, thereby establishing a Jacksonville branch of Southern.
This was not the first time that GNB foreclosed on, and Mr. Smith took control of, a distributor. In the fall of 1987, Mr. Smith's sister and brother-in-law owned Carolina Battery in North Carolina. They experienced financial problems and GNB foreclosed. Southern then paid the debts of Carolina Battery and purchased its assets.
Although Danco argues that GNB's prior foreclosure activities support its claim of a conspiracy with Southern, this record contains no direct proof of any link between the prior foreclosures and the activities relating to Danco. Nor does the record contain any direct proof of a conspiracy between Mr. Smith and GNB concerning these transactions. I can find no reasonable inference arising from this circumstantial evidence to support a theory of conspiracy between GNB and Southern. GNB was simply enforcing its rights concerning distributors who were behind on their payments, and Mr. Smith was protecting his business interests in those distributors.
*498 After opening a branch in Ocala, Southern opened a warehouse in Tampa in early December 1988. In conjunction with the opening of the Tampa branch and in preparation for opening a Miami branch, Southern hired two key employees from Danco. A salesman from Danco in Tampa and the warehouse manager for United Miami were both hired prior to the filing of this action. When the Miami branch of Southern opened in January, United Miami closed and two more of its former employees went to work at Southern. With operations established in both Tampa and Miami, and with the assistance of the former Danco employees, Southern began servicing many of Danco's customers.
In mid-January 1989, after this lawsuit had been filed, a GNB representative contacted Mr. Smith at Southern and requested a meeting with Mr. and Mrs. Smith. On January 17, 1989, the Smiths met with GNB and discussed the possibility of GNB acquiring a portion of Southern. There is testimony provided by both GNB and Southern that this was the first time the possibility of an acquisition was discussed. Danco did not present evidence to the contrary. Negotiations continued for several months, and following an audit of Southern's financial records, GNB purchased substantially all assets of Southern on September 29, 1989.

III. THE TRIAL
When Danco answered GNB's complaint, it filed its counterclaim for intentional interference with business relationships. Danco maintained that GNB tortiously interfered with its business relationships either alone or in a civil conspiracy with Southern. A jury trial occurred between September 23 and October 4, 1991. Although this opinion will discuss six arguably impermissible business practices, at trial Danco emphasized three actions which it claimed to be interference: (1) GNB's attempted repossessions at Danco and United Miami; (2) GNB's discontinuing the supply of batteries to Danco; and (3) Southern Battery's hiring of key Danco employees. After the relevant motions for directed verdict were denied, Danco's counsel argued vigorously to the jury that these actions were improper. Even if Danco did owe GNB money, he argued that GNB had no right to "squash [Mr. Pernas] like a bug."
The jury returned a lengthy interrogatory verdict, a portion of which was not properly answered according to the written instructions on the verdict form.[7] The jury found Danco and Mr. Pernas liable to GNB for $605,540.33 on the claim for unpaid batteries. It also found that Danco was entitled to $234,505.81 for setoffs and credits arising from the confusion in the accountings. Additionally, it found that GNB had breached the contract with Danco by failing to give sixty days' notice, resulting in damages of $100,000. Although the jury found that GNB was owed a net of approximately $270,000, it also awarded Danco $1,025,000 for tortious interference with business relationships. Judgment was entered on this verdict. A post-trial motion for judgment in accordance with GNB's motion for directed verdict was denied.

IV. NO EVIDENCE OF IMPROPER METHODS
Danco theorizes that the evidence established a long-term plan to run it out of business. It maintains that GNB intentionally failed to resolve the accounting problem so that it could harass Danco, publicly humiliate Danco with a public repossession, encourage its employees to abandon Danco, and then ruin Danco's credit record by filing this lawsuit and claiming that it owed a sizable amount of money. It claims that GNB planned to ruin Danco, allow Southern to fill the void, and then take control of Southern. There is, however, no direct proof in this record of such a theory. At best, this theory relies upon a tall pyramid of weak inferences. See Voelker v. Combined Ins. Co., 73 So.2d 403 (Fla. 1954); Commercial Credit Corp. v. Varn, 108 So.2d 638 (Fla. 1st DCA 1959).
*499 From my review of the record, Danco has not proven a recognized theory of tortious interference. First, it did not overcome the fact that GNB had a valid motive to collect on these accounts. Second, the evidence concerning alleged improper business methods did not establish a prima facie case for submission to a jury.[8] It appears from this lengthy record that Danco suggested six possible improper methods of interference.

1. GNB stopped the supply of batteries to Danco without sixty days' notice.

Manufacturers, as a matter of state tort law, are not compelled to supply retailers, especially on credit terms. If GNB had a duty to continue the supply of batteries to Danco, this was based on contract. Danco pleaded a breach of the oral sixty-day notification requirement, and the jury awarded it $100,000 for this claim. Although I see no evidence that Danco even asked to buy batteries from GNB after December 20, this claim is at best a matter of contract law. It is not an improper method of competition under any statute and should not become an issue under a common law tort theory.
Danco requested and received $100,000 from this jury for breach of contract on this identical theory. While there may be some set of circumstances in which a breach of contract could also be tortious interference resulting in additional damages, such circumstances are not present in this case. Like fraud, when an alleged act of interference and a breach of contract are essentially identical, the recovery should be limited to the jury's verdict for breach of contract. John Brown Automation, Inc. v. Nobles, 537 So.2d 614 (Fla. 2d DCA 1988), review denied, 547 So.2d 1210 (Fla. 1989).[9]

2. GNB's attempt to repossess batteries in Tampa and Miami.

There are two problems with this theory. First, GNB had a contractual right to repossess batteries from Danco under both the PCI and the GNB contracts. Even if Danco had a $300,000 verbal line of credit (as it claims), GNB had a valid reason to believe Danco was in default on December 20. Indeed, the jury found that GNB was owed well more than $300,000 on that date. The fact that the batteries, which were the security, had dwindled in value to $20,000 is probably a reason to attempt to repossess, not a reason to forego that right.
Second, I do not understand how this attempted repossession directly interfered with Danco's business dealings with its customers. Obviously, GNB's attempted repossession did not stop United Miami from dealing with Danco, because Mr. Pernas controlled that company.[10] Presumably Danco did receive some bad publicity both from the attempted repossession and from the simultaneous filing of this lawsuit. Danco owed a large debt to GNB that had been unresolved for months. This caused it some bad public relations. Danco never offered to pay a significant sum toward this debt or even to place $300,000 in an escrow account while the dispute was resolved. The failure to take the steps necessary to pay one's creditors may hurt business. This is the reality of a free enterprise system.

3. Southern Battery convinced Danco's employees to leave.

I will assume that GNB is directly responsible for Southern's successful effort to hire *500 two employees from Danco. There is no evidence that those employees had written contracts containing non-compete agreements. In a free economy, competitors hire employees from one another on a regular basis. Indeed, the evidence reflects that Danco had hired one of these two employees away from PCI.
It is common for an employer to woo a competitor's employees, not only with more money, but with claims that it will provide a more secure place to work. I see no basis to make this conduct an unjustified business method.

4. GNB's alleged communication with Douglas Battery.

Although the evidence reflects that Douglas Battery communicated with GNB before it declined to sell batteries on credit to Danco in 1989, there is no evidence concerning the content of those conversations. There is no reason to assume that GNB told Douglas anything more than the fact that it was suing Danco for $600,000 on a disputed account and that it no longer wished to do business with Danco. That would cause many suppliers to be wary about extending credit to a relatively small wholesaler. There is no proof that GNB told Douglas Battery anything that was inaccurate or defamatory.

5. GNB failed to resolve the account in order to file a damaging lawsuit.

This claim is more a speculative theory than a matter of evidence. No direct evidence supports this theory. I am inclined to believe it involves a sizable pyramid of inferences from circumstantial evidence.
In December 1988, after months of negotiations, GNB demanded $600,000 and Danco claimed a setoff of $700,000. If this is a matter of bad faith, it is bilateral. Accounts in disarray frequently take time to sort out and frequently result in litigation. I do not see a prima facie case for an improper business method in these unsuccessful negotiations. Moreover, I fail to see how this directly interfered with Danco's business relationships with its customers or suppliers.[11]

6. GNB gave better terms to Southern Battery.

Sometimes a supplier treats a big customer better than a little customer. Sometimes one customer has a better credit history or business record than another. That is the way of free enterprise. Danco did not file an antitrust claim arising from this alleged preference and did not prove such a theory. I see no valid reason to allow these allegations of lawful preference of a competitor to constitute a prima facie theory of improper business method.
Although the business tactics employed by GNB and Danco in their case were not for the faint of heart, our free economy is based on competition and not on a selfless spirit of communal generosity. This judgment tells creditors that they are no longer free to take strong steps to collect big debts from struggling customers. Even if those steps violate no statute created by the legislature and are not independently tortious, this judgment implicitly authorizes courts to permit juries on a case-by-case basis to award damages to the debtor. This is a gentle result to debtors, but I am inclined to believe that the law should protect creditors in these circumstances.
NOTES
[1] See, e.g., Security Title Guarantee Corp. v. McDill Columbus Corp., 543 So.2d 852 (Fla. 2d DCA 1989); Fort Lauderdale Riverwalk Properties, Inc. v. White, 531 So.2d 739 (Fla. 4th DCA 1988), review denied, 541 So.2d 1173 (Fla. 1989); Menendez v. Beech Acceptance Corp., 521 So.2d 178 (Fla. 3d DCA 1988); Barroso v. Respiratory Care Servs., 518 So.2d 373 (Fla. 5th DCA), review denied, 525 So.2d 880 (Fla. 1988); Rosa v. Florida Coast Bank, 484 So.2d 57 (Fla. 4th DCA 1986); Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla. 3d DCA 1980), review denied, 392 So.2d 1371 (Fla.), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).
[2] At least for a short period after GNB purchased PCI, Danco continued to buy PCI batteries, as compared to GNB batteries.
[3] To place this amount in perspective, Danco's gross sales of batteries for the year ending June 30, 1988, totalled approximately $2,000,000. Thus, the claimed indebtedness is 30% of annual gross sales.
[4] There is testimony that Mr. Pernas also made threats of litigation at this meeting. For purposes of this dissent, however, I do not rely on such testimony as it is irrelevant to the conclusion that no unjustified interference occurred.
[5] In addition to the batteries, GNB planned on retrieving a forklift and fax machine, belonging to them, that they believed were wrongfully in the possession of Danco. As it is irrelevant to the issues of conspiracy and tortious interference with business relationships, the facts relating to those items are not discussed here.
[6] The evidence at trial showed that Mr. Pernas sold the Danco building in Tampa to himself, and other business assets to his wife, who is now operating a business called "Anco," which sells batteries to some of Danco's former customers. For purposes of this dissent, however, I assume that Danco was run out of business by GNB's actions during the fight over the outstanding amounts owed to GNB.
[7] This error on a collateral issue is probably not harmful in this case, but it is disturbing and indicates that the jury was unable to follow simple written instructions. Oddly, the clerk erred when the verdict was published and read "yes" where the verdict is marked "no." Her error concealed the jury's error, which was only discovered during the pendency of this appeal.
[8] Under Florida law, there is no cause of action for civil conspiracy unless one of the co-conspirators actually committed the underlying tort which constituted the subject of the conspiracy. Liappas v. Augoustis, 47 So.2d 582 (Fla. 1950); Miller v. Selden, 591 So.2d 1063 (Fla. 4th DCA 1991). Accordingly, GNB was also entitled to a directed verdict on the theory of conspiracy.
[9] By its unqualified use of the term "tort" the supreme court has arguably expanded the economic loss rule to intentional torts that are structured to protect purely economic interests. See Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc., 620 So.2d 1244 (Fla. 1993). If this is true, then no recovery would be available in this case under the claim of tortious interference. I am not inclined to believe that the supreme court intends this result. See Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349 (Fla. 2d DCA 1992).
[10] I am assuming that GNB had no right to repossess batteries at United Miami Battery. This assumption ignores evidence that GNB shipped batteries directly to that warehouse for Danco, and had a security agreement describing that location as another business location of Danco.
[11] In its allegations, Danco also accuses GNB of filing an inaccurate credit report with Dun & Bradstreet. There is virtually no evidence in this record concerning this report. There is no written proof of its contents. There is no proof that Dun & Bradstreet disclosed this record to any supplier or customer, let alone any proof that these third parties relied on the report. Danco did not argue this issue to the jury, and I conclude that it abandoned this theory during the trial. It certainly would not support this verdict.