675 So.2d 655 (1996)
Willard KEESEE, Appellant,
v.
Karen KEESEE, Appellee.
No. 95-229.
District Court of Appeal of Florida, Fifth District.
June 14, 1996.
Patricia L. Strowbridge of Patricia L. Strowbridge, P.A., Orlando, for Appellant.
Sharon Lee Stedman of Sharon Lee Stedman, P.A., Orlando, for Appellee.
W. SHARP, Judge.
Willard (Craig) Keesee appeals from a final judgment of dissolution of marriage. He argues on appeal that the trial court erred in awarding primary residential custody of the parties' six-year-old daughter and two-year *656 old son to the former wife, Karen Keesee, and having done so, that the visitation schedule imposed by the court was not sufficiently "liberal." We affirm.
The party who seeks to challenge a trial court's initial custody decision in a contested custody case carries a heavy burden. Where the testimony is in conflict, the trial court must resolve all factual disputes.[1] The appellate court cannot readdress the credibility of witnesses (weight to be given to testimony by A. as opposed to B.) and the resolution of directly contradictory statements by witnesses.[2] Further, the initial custody determination by a trial court is one clothed in the longest of discretionary robes. Only if the appellate court concludes, after reading the record from beginning to end, that no reasonable trial judge would have reached the conclusion being appealed (another way of saying there was an abuse of discretion), is a reversal possible.[3]
Counsel for Craig asserted at oral argument in this case that there was no competent evidence in the record upon which the trial court could reasonably have based its ruling. Counsel for Karen assured us there was more than a sufficient basis in the record. Under such circumstances, we have no choice except to read the entire record. Both attorneys cannot be right.
This case was vigorously litigated over a three-day period. Numerous witnesses appeared for both sides. There were expert witnesses, family members, neighbors, social friends, school teachers and acquaintances, a guardian ad litem, and the parties themselves. The record in this case arrived at the appellate court in a packing-sized box. We affectionately call such cases in the Fifth District a "box" case.
After reviewing the record in this case, we conclude that there was sufficient competent evidence to support the trial judge's rulings, and we cannot hold he abused his discretion. We choose to write an opinion in this case because we wish to warn appellate counsel not to make such arguments without good cause. However partisan the lawyer, and however intense the litigation below has been, candor with the appellate court is the only option. In the future, such extreme positions which prove to be without substance, may be grounds for this court to impose sanctions or take other measures to discourage such practice.

I. Determination of Primary Residential Custody in Former Wife's Favor

In deciding whether the record supports the trial judge's determination which favored the former wife in this case, we must, as an appellate court, read the record in a manner most favorable to her, and disregard any conflicting evidence counter to her position.[4] Had the trial court ruled in favor of the former husband, we would be reading the record to support his position. The following is a summary of the evidence and record presented, which supports Karen as the parent best suited to have primary residential custody of the children.
Numerous witnesses testified Karen is a loving, concerned parent, who had been the children's primary caretaker since birth. She was the parent who took them to their pediatricians for regular checkups, and for various illnesses. She participated in an unusually large number of programs and activities with the children: a parent-run preschool co-op; the Sunshine Generation Performance program; the PTA; volunteering as an Addition in the public school; sports programs; the M.D. Anderson counseling program for children whose family members have cancer; and religious instruction at the Holy Family Catholic Church. Not until appellant had temporary *657 custody of the children did he participate to any extent in such programs.
Further, the testimony established that Karen was by far the more supporting, nurturing and loving parent. She put the children's interests and concerns before any other matter. She tried to educate herself to be a better parent by taking parenting classes and reading books about subjects relating to the children. She considered the daughter was "gifted" and thus checked out library books about how to raise such a child. She also sought help from experts and checked out books when she thought her son had a speech-delayed problem caused by numerous ear infections. She also played with the children, took them on field trips, to the park, swimming and read to them. During the marriage, appellee's job kept him away from home long hours, and he did not participate in such activities.
The court-appointed psychologist, Dr. Fleischmann, who did a custody evaluation for the court of the parties and the daughter (the son was too young) and the guardian ad litem, both concluded that appellee had by far the greater insight into the children's feelings and emotional needs and had met this responsibility well in the past. Since receiving counseling during the pendency of the dissolution, she was in a superior position to continue to do so. She also evidenced a superior willingness and desire to foster a continuing and close relationship with appellant, and the two sets of grandparents. There was evidence in this record that the daughter was much more closely bonded to appellee, and that although she loved her father, she was fearful and insecure with him, due to having witnessed his physical and emotional abuse of her mother.
Neither party in this case was free from blame or fault. Karen was shown to have abused taking diet pills which contained a prescription drug called phentemine, a "first cousin" to amphetamines. She was a rather messy housekeeper, and did not handle the family finances in a responsible manner. She partly blamed appellant for the financial difficulties in which they found themselves at the end of the marriage, and she accused him of consuming at least half of the diet pills, which were over prescribed for her. But, she admitted having problems and sought counseling. At the time this final hearing was held, the expert witnesses who evaluated her, felt she was making progress on all fronts, and that her prognosis to overcome her problems was good.
In contrast, appellant denied he had any problems, or that he needed any kind of counseling. There was contrary evidence. Based on it, the court could have found that appellant had committed physical and emotional spouse abuse during the course of the marriage, more particularly, during the last two years the parties lived together. His ugly conduct escalated from threats and yelling, to pushing and hitting, and at the end of the marriage, such conduct took place in front of the children, causing damage to the daughter's feelings for him.
A pivotal piece of the evidence was a Christmas morning tape made by appellee of their home, Christmas tree, and children opening their presents. The trial judge, the guardian ad litem, and Dr. Fleischmann all viewed the tape. So did we.
In the tape, the appellant and appellee begin to argue about finances. Karen asks Craig to back off and let the children enjoy their Christmas. But Craig says he cannot. Things escalate. The tape records Craig threatening to smash Karen's face in because she is "pissing" him off. She tells him she just recorded that threat on tape. Craig grabs the camcorder from her, hits her in the head with it (she testified) and breaks it. The picture vanishes but the sound continues to record. The children can be heard, terrified and screaming in the background. Craig then walks out of the house and is gone for days without letting them know where he is. One witness who saw the tape said Craig's depicted behavior did not surprise her. It was not unusual for him.
Dr. Fleischmann said in his report, and at the trial, that this taped incident showing appellant as sullen, angry, cursing and ultimately aggressive, illustrated appellant's lack of concern about the children's emotional well-being. He said the tape struck him *658 powerfully as an "appalling display of insensitivity to the kid's needs."
Appellant also denied ever taking any of Karen's diet pills. Yet at least five witnesses testified he or she had seen him do so on various occasions. Karen testified Craig took as many of her pills as she did. He used them to get high when they went out in the evening, or socially with friends, and then late at night, to enable him to have sex with her. There was also testimony that appellant, during the time he had temporary custody of the children, slammed the door in appellee's face so that the daughter could not kiss her Mom goodby, and that he limited or restricted telephone contact by appellee with the children while they were in his household. He denied this behavior also.
Some of the most damaging evidence against appellant was brought out by his own counsel, during the cross-examination of Karen at the trial. This may have been as much Craig's fault for not being forthright with his attorney, as hers for not knowing what the answers would be to her questions. For example, Karen was asked why the cable bill for the marital residence was put in her maiden name rather than her married name. She replied that before the parties were married, Craig had been caught stealing cable, so the cable company refused to grant cable in his name. The parties lived in a residence owned by his parents, where Craig had been living, prior to their marriage.

II. Propriety of Allowing Dr. Fleischmann to Act as The Court's Independent Expert Witness.

Dr. Fleischmann was selected by stipulation and agreement of both parties to serve as an independent expert to make a recommendation to the court, concerning the primary residential custody of the children. Over the course of a number of weeks, he met with appellant and appellee, gave them tests, and talked with them. He observed them interacting separately and playing with their daughter. He also talked to and tested the daughter. He then wrote up reports for the court on all three, and made a formal letter recommendation that primary residential custody be granted to Karen. These documents were sent to the court, directly. In court, he testified more fully about his perceptions and conclusions. The reports are dated January 11, 1995. The trial commenced on January 18 and ran through January 20th. At the end of the case, the court stated it had relied on the reports in making its decision, and without objection, it placed the written reports in evidence as the court's exhibits.
On January 12, 1995, appellant moved to disqualify Dr. Fleischmann from acting as the court's independent expert because he had consulted with Dr. Freeman in making his reports, and Dr. Freeman was a therapist Karen was working with, in Dr. Fleischmann's office. Information obtained from Dr. Freeman primarily concerning Karen, and identified as such, does appear in Dr. Fleischmann's written report. One day before the trial, appellant convened a hearing to disqualify Dr. Fleischmann. After taking testimony, the trial court denied the motion.
At the trial, no objection was raised by appellant to placing the reports in evidence. Appellant's counsel, however, did object to Dr. Fleischmann's impartiality. In the event this issue was preserved for appeal, we find no error here. Dr. Fleischmann testified he merely shared office space with Dr. Freeman and that their files and practices were completely separate. He also said he had concluded all of his evaluations before talking with Dr. Freeman about Karen (with Karen's permission).
Dr. Fleischmann further testified that consulting with other therapists who were treating or who had treated a person within the past two years, was standard operating procedure, pursuant to the American Psychology Association Guidelines for Child Custody Evaluations (1994). This was not disputed or refuted. Pursuant to the guidelines, he testified he had consulted Dr. Freeman via the telephone for a thirty-minute conference. That was the extent of his contact with Dr. Freeman regarding the parties. Dr. Fleischmann also testified Dr. Freeman's statements did not influence his views. They merely confirmed what he had already concluded.
*659 The timeliness of the motion to disqualify is also called into question by the testimony of Dr. Fleischmann. He said Craig actually ran into Karen, at his office in November, when he was there for a session with him. Karen was there to see Dr. Freeman. Craig must have been aware, at that point that Karen was in counseling with Dr. Freeman. Motions to disqualify could have been filed then, rather than in January, after Dr. Fleischmann's report was complete and the trial was imminent. But even without Dr. Fleischmann's reports and testimony, there was abundant sufficient evidence to support the judgment being appealed.

III. Visitation

All of the expert witnesses and the guardian ad litem recommended that appellant be given liberal visitation with the two children. The trial judge said he agreed to that, but he was concerned that appellant participate in parenting education classes. The court left the working out of the visitation schedule to the attorneys who represented the parties. They prepared proposals, and revisions, and amendments to the revisions. They were not far apart.
At the final hearing, the trial judge made an effort to accommodate appellant's desire for longer visitation on Mondays (his day off), and everyone agreed. The schedule actually entered by the court appears substantially in accord with that agreement. It includes unrestricted visitation and overnights at appellant's residence every other weekend and appellant may extend the weekend through Monday at his option; plus numerous other holidays and visits during the summer.
We are not prepared to say this visitation schedule is an abuse of discretion because it is not sufficiently "liberal." Visitation can be adjusted if the specifics of the schedule prove impractical or if the parties experience difficulties due to distance between residences, or jobs, which were the primary problems in this case. It appears the trial judge, by adopting an appropriate visitation schedule, made an effort to accommodate appellant in this case, and if necessary, would do so again.
AFFIRMED.
PETERSON, C.J., concurs.
GRIFFIN, J., concurs specially, with opinion.
GRIFFIN, Judge, concurring specially.
I vote to affirm in this case, as I necessarily do in any such case where I can identify evidence in the record that the lower court judge, as the finder of fact, could have chosen to believe. I am bound to say, however, that I am increasingly concerned about the proliferating and extensive use of psychologists in these family law cases and the extreme reliance trial courts appear to place on their opinions. These experts conduct interviews, sometimes do tests and then are allowed to render opinions on an extraordinary range of subjects. They have been allowed to offer opinions on why a child nestles with its parent (no, it's not necessarily love), whether someone is prone to domestic violence, who is telling the truth and who is "in denial." Yet, no one seems to be able to muster any measure of the competence or the reliability of these opinions. On the one hand, it is certainly desirable to bring before the court as much evidence as possible to assist the trial court in making the best decision concerning the raising of children in families torn by divorce. On the other hand, rules of evidence exist for a reason, and the issue of competency of such a broad reach of expert testimony is not something that should be taken lightlyparticularly in such cases where there is frequently little other objective or disinterested evidence on which the court can rely. These psychological evaluations in many cases amount to no more than an exercise in human lie detection. For example, in this case, the psychologist testified that husband's test results were not valid because he described himself as a moral and virtuous person, which put him at the "pathological" level on the "lie scale." Wife, on the other hand, was described as "forthcoming." On the hotly contested issue of her substance abuse, he testified that she scored within "normal limits" insofar as predisposition to engage in substance abuse and that you "can't fake that scale." This same psychologist was vehemently attacked in another case by the same counsel who here represents the *660 wife on the ground that this psychologist's own addictive behavior makes him "unable to pass judgment as to the addiction of another."
There also is an unseemly pattern emerging in some of these cases of conduct that amounts to a conflict of interest, or, at the very least, a failure of disclosure. This is especially common in "court appointed expert" cases, where unbeknownst to one side or the other, the "independent" or "court" psychologist has a former or current professional or business relationship with one of the lawyers or with the psychologist for one of the contestants. It is very dangerous for counsel to agree to an "independent" expert in these cases unless he or she can be sure the psychologist truly is independent of the opposing side.
After several years of reading records in these cases, my own confidence in such evidence has fallen very low.
NOTES
[1] Exchange Natl. Bank of Winter Haven v. Smith, 148 Fla. 473, 4 So.2d 675 (1941); Schmeck v. Sea Oats Condo. Ass'n, Inc., 441 So.2d 1092 (Fla. 5th DCA 1983).
[2] Lamas v. Lamas, 660 So.2d 765 (Fla. 3d DCA 1995); GNB, Inc. v. United Danco Batteries, Inc., 627 So.2d 492 (Fla. 2d DCA 1993).
[3] Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Kremer v. Kremer, 595 So.2d 214 (Fla. 2d DCA 1992); Blaty v. Blaty, 443 So.2d 297 (Fla. 3d DCA 1983).
[4] Miller v. Nifakos, 655 So.2d 192 (Fla. 4th DCA 1995); Burgess v. Burd, 654 So.2d 1028 (Fla. 1st DCA 1995).