650 So.2d 1073 (1995)
Emily Black PYNE, f/k/a Emily Winkle Black, Former Wife, Appellant,
v.
James L. BLACK, Former Husband, Appellee.
No. 93-2261.
District Court of Appeal of Florida, Fifth District.
February 17, 1995.
*1074 Zelda J. Hawk of Law Office of Zelda J. Hawk, Gainesville, for appellant.
Robert L. Appleget, Jr. of Appleget, Lizarralde & Jerry, Ocala, for appellee.
GOSHORN, Judge.
Emily Black Pyne appeals after the trial court denied her motion for contempt based upon the former husband's failure to pay child support. Her former husband, James L. Black, ceased paying any child support for the parties' two daughters after February 6, 1981, when the younger girl was 12 years old and the older girl was 16 years old. Black's child support obligations ran through the time the girls turned 21 years of age, pursuant to the parties' 1972 dissolution decree, and thus was a "limbo" judgment[1] to the extent it encompassed the child support payments which accrued after the girls turned 18. This motion was brought 12 years after Black ceased paying child support and 4 years after the younger girl reached 21 years of age.
The trial court made its ruling after conducting an evidentiary hearing and considering the depositions of the parties. Judge McNeal's well reasoned opinion, which is set out in its entirety, is fully supported by the record. Judge McNeal wrote:
ORDER DENYING FORMER WIFE'S MOTION FOR CONTEMPT
Upon consideration of the former wife's Motion for Contempt and the evidence presented by the parties, the court finds that the former wife's attempt to collect child support twelve years after the former husband stopped paying and four years after the youngest child attained the age of 21 is barred by equitable estoppel and laches and that the former wife does not have standing to collect post-majority child support.
In 1980 the former husband returned permanently to Marion County and attempted to establish normal visitation with his children. The former wife rebuffed the former husband's request to establish frequent and continuing contact with the children by denying him visitation at Thanksgiving and at Christmas in 1980.
This was the first time the parties experienced any problems with visitation. Before then the former husband contacted the former wife when he was able to visit and she made the children available. This flexible arrangement was necessary because the former husband worked all over the world for extended periods of time and it was impossible for him to exercise normal visitation. The former wife was comfortable with this arrangement and did not want to increase this infrequent contact. She had remarried. She had a new baby and she was afraid more frequent visitation would disrupt the new family's routine.
The former husband retained an attorney in January, 1981 and requested a specific visitation schedule. The former wife hired an attorney and opposed the former husband's request without offering any *1075 hope for negotiation. After the response from his former wife's attorney, the former husband stopped paying support. The former wife consulted her attorney who "understood ... the situation." He advised her that under the circumstances she should not bring her former husband to court if she could get along without the support. Based on his advice she made an informed and voluntary decision to forgo her right to child support because the former husband would have insisted on his right to visitation with the children. Neither party asserted their rights in court, each relying on the other's unspoken agreement to not litigate these issues.
The former husband never visited with his children again. In the years that followed her decision, the former wife did not make even the slightest effort to encourage contact between the children and their father. Her refusal to foster and encourage a relationship between the children and their father is graphically illustrated by the children's Christmas gifts from their father in 1981 which have remained in her attic for almost twelve years, unopened.
In 1981 the law allowed a noncustodial parent to withhold support when the custodial parent failed or refused to allow visitation. See, e.g., Warrick v. Hender, 198 So.2d 348 (Fla. 1967) (proper to deny contempt for nonpayment of support where second husband performed the role of father for the step-children and although the first husband was granted reasonable visitation in the divorce decree, contact between him and the children was virtually nonexistent); Craig v. Craig [157 Fla. 710], 26 So.2d 881 (Fla. 1946) (refusal to permit visitation is sufficient legal defense to action to enforce support); Phillips v. Adams, 339 So.2d 665 (Fla. 4th DCA 1976) (court erred in not allowing father to present evidence that mother denied him visitation in response to an order to show cause for nonpayment of support); Denton v. Denton, 147 So.2d 545 (Fla. 2d DCA 1962) (requiring father to pay child support arrearage for time when mother failed to allow visitation was error). Withholding support was an acceptable method of enforcing visitation, but there was not a corresponding rule that allowed a custodial parent to withhold visitation when child support was not paid. Howard v. Howard, 143 So.2d 502 (Fla. 3d DCA 1962). The law did not change until 1986 when the legislature enacted § 61.13(4)(b). Effective October 1, 1986 a noncustodial parent could no longer withhold support when a custodial parent refused to allow visitation.
Ordinarily parents may not contract away the rights of their children to support or waive their children's right to support by acquiescence. Lee v. Lee, 157 Fla. 439, 26 So.2d 177 (1946); Robinson v. DHRS, 473 So.2d 228 (Fla. 5th DCA 1985). This rule makes sense where minor children can use the support or where the custodial parent has expended funds above that parent's legal obligation to provide support, but in this case the youngest child is 25 years old and there is not any evidence that the former wife expended any funds above her obligation to pay support. Also, the children did not endure any hardship and did not have to rely on public assistance. See Gibson v. Bennett, 561 So.2d 565 (Fla. 1990) (discussion of reasons for enforcing support after emancipation). Even though waiver and emancipation are not legal defenses, the doctrines of equitable estoppel and laches prevent the former wife from enforcing the child support under the circumstances of this case.
In order to establish the defense of laches the former husband must prove the four elements set forth in Van Meter v. Kelsey, 91 So.2d 327 (Fla. 1956). The first three elements concern the wife's delay in asserting her right to support in court. Since 1981, the former wife has known how to contact the former husband. He has lived at the same address in Marion county with the same listed telephone number. She has not offered a reasonable explanation for her delay in bringing this action to collect support.
However, unreasonable delay is insufficient by itself to prove laches. Cartee v. Carswell, 425 So.2d 204 (Fla. 5th DCA 1983). The significant question is whether the former husband suffered legal prejudice *1076 from her delay. Legal prejudice results when there is a loss or injury to a person who relies on another person's voluntary failure to exercise a legal right. This is primarily a question of equity and depends on the unique circumstances of each individual case.
Both parties are at fault for failing to fulfill their obligations as parents, but the lost child support did not deprive the children of any of life's necessities. It will not affect their current welfare. In contrast, the lost visitation deprived the former husband and the children of a father-daughter relationship. The opportunity to form that relationship is lost forever and cannot be repaid. For this reason the former husband suffered legal prejudice. See Robinson v. DHRS at 229 (where children's current welfare was not affected there was not a compelling reason for refusing to apply laches; lost visitation may establish legal prejudice).
On the issue of standing the court finds that the former wife did not prove that she provided any support for the children beyond her own legal responsibility. The former wife does not have standing to enforce the children's right to post-majority child support arrearage. DHRS v. Holland, 602 So.2d 652 (Fla. 5th DCA 1992); Cronebaugh v. Van Dyke, 415 So.2d 738 (Fla. 5th DCA 1982), review denied, 426 So.2d 25 (Fla. 1983).
ORDERED AND ADJUDGED AS FOLLOWS:
1. The former wife's motion for contempt is denied.
2. Collection of the past due child support is barred.
3. Each party shall pay their own attorney's fees and costs.
DONE AND ORDERED at Ocala, Marion County, Florida this 17th day of August, 1993.
 /S/
 Raymond T. McNeal
 Circuit Judge
We are bound by the facts (supported by the evidence) found by the trial judge and affirm Judge McNeal's order in its entirety. See Helman v. Seaboard Coast Line R.R. Co., 349 So.2d 1187, 1189 (Fla. 1977) (stating that it is not the appellate court's function to reevaluate evidence and to substitute its judgment for that of the fact finder); GNB Inc. v. United Danco Batteries, Inc., 627 So.2d 492, 493 (Fla. 2d DCA 1993) (same).
AFFIRMED.
COBB, JJ., concurs.
W. SHARP, J., dissents with opinion.
W. SHARP, Judge, concurring in part, dissenting in part:
I agree with the majority opinion in its conclusion that the child support arrearages which accrued after the two children turned eighteen years of age cannot be enforced by the appellant, the former wife, because of lack of standing. However, I disagree that the arrearages which accrued while the children were under eighteen years of age should be also denied on the basis of estoppel or waiver. The facts and circumstances in this case are not so extreme as to merit such a result. In order to fairly assess this case, however, it is necessary to review the transcript and record on appeal. If the trial judge's findings, which are quoted in full in the majority opinion, were all we had to look at, I would have concurred with the majority.
Pyne (the former wife) and Black (the former husband) divorced in 1972. Custody was awarded to Pyne and Black was obligated to pay $187.50 per month per child, until each of the parties' two daughters attained the age of twenty-one. Pyne filed two motions for contempt against Black from 1972 to 1975 due to Black's failure to pay child support. The disputes were apparently resolved by a joint stipulation which reduced Black's child support obligation to $131.00 per month per child. Black paid the child support through February of 1981, but ceased making any further payments thereafter.
In 1992, Pyne filed this proceeding. Rhonda turned twenty-one years of age in 1986, Allison in 1989. The total unpaid arrearages were $20,680.00.

*1077 I. STANDING

With regard to the child support arrearages which accrued after the parties' daughters attained the age of majority in Florida (eighteen years old), we are bound by Cronebaugh v. Van Dyke, 415 So.2d 738 (Fla. 5th DCA 1982), rev denied, 426 So.2d 25 (Fla. 1983), a case from which this court has not receded.[1] Accordingly, Pyne lacks standing to sue Black to enforce or collect any post-majority payments.[2]
With regard to the child support arrearages which accrued prior to the girls' attaining eighteen years of age, Gibson v. Bennett, 561 So.2d 565 (Fla. 1990) has made uniform in this state the rule of law that a former custodial spouse has standing to enforce and collect child support arrearages, even though the child has, by the time of the suit, attained eighteen years of age. Justice Kogan explained the rationale for that rule of law in Gibson:
Upon a child reaching eighteen, the custodial parent is not magically reimbursed for personal funds spent nor debts incurred due to nonpayment of child support... . Society's interest in ensuring that a parent meets parental obligations must not be overlooked simply because the child has attained the age of majority. The support obligation does not cease; rather it remains unfulfilled.
561 So.2d at 572.
This court earlier receded from Cronebaugh in Parish v. Department of Health and Rehabilitative Services, 525 So.2d 1029 (Fla. 5th DCA 1988), and Department of Health and Rehabilitative Services v. Blue, 564 So.2d 243 (Fla. 5th DCA 1990) on the issue of standing to enforce pre-majority arrearages. Nevertheless, some doubt may have lingered prior to Gibson because the rationale of Cronebaugh, as further elaborated in Holland, logically bars standing for custodial parents to enforce child support arrearage accruing before or after the child attains its eighteen-year-old majority when suit is brought after the child attains that age. Gibson was followed in Kutz v. Fankhanel, 608 So.2d 873 (Fla. 5th DCA 1992). Thus, the trial court correctly ruled below that Pyne has standing to sue to recover arrearages which accrued for Rhonda while she was between sixteen to eighteen years of age, and for Allison, while she was between twelve and eighteen years of age.

II. DENIAL OF VISITATION

Florida courts characterize child support obligations as morally superior duties imposed by law.[3] Child support is enforceable by contempt proceedings or by a judgment for arrearages, and these remedies are not barred by the statute of limitations. The payments vest as they accrue, and are not modifiable retroactively.[4] This policy is designed to promote prompt payment of child support and to encourage the noncustodial parent to seek a remedy in court rather than unilaterally terminate child support, if there are problems with visitation or how the custodial *1078 parent is handling the children's relationship with the noncustodial parent.[5]
Formerly, one of the most often used defenses to a suit to collect child support arrearages was the charge that the custodial parent had denied the obligated parent's visitation rights with the child or children. In such cases, courts reduced or refused to enforce child support obligations and arrearages.[6]
However, the custodial parent was forbidden to deny or limit visitation because the obligated parent's child support obligations were not being met.[7] These dual rules of law redounded (as a practical matter) to the economic misfortune of children, and their mothers, who most frequently were the custodial parents. It was clearly a "heads I win, tails you lose" situation for them.
Perhaps recognizing the harmful effect the denial of visitation defense was having on children, the Florida Legislature amended section 61.13 by adding subsection (4), effective October 1, 1986. The statute now provides as follows:
(a) When a noncustodial parent who is ordered to pay child support or alimony and who is awarded visitation rights fails to pay child support or alimony, the custodial parent shall not refuse to honor the noncustodial parent's visitation rights.
(b) When a custodial parent refuses to honor a noncustodial parent's visitation rights without proper cause, the court may:
1. After calculating the amount of visitation improperly denied, award the noncustodial parent a sufficient amount of extra visitation to compensate the noncustodial parent, which visitation shall be taken as expeditiously as possible in a manner that does not interfere with the best interests of the child; or
2. Award the custody of primary residence to the noncustodial parent, upon the request of the noncustodial parent, if the award is in the best interests of the child.
In this statute, the Legislature has decreed that child support and child visitation are separate rights and duties, and should be dealt with separately. One is no longer to be treated as the reciprocal of the other. Denial of visitation is no longer a valid basis to reduce or deny child support.
It appears that section 61.13 quoted above may completely abolish denial of visitation as a defense to a suit to enforce child support arrearages en toto. But even if it does not, Pyne's conduct in this case was not so reprehensible as to merit denial or reduction of child support, based on the old case law applied to the facts in this case.
Both parties agreed Black exercised few, if any, visitation rights with his children, following the parties' dissolution. He saw them only two or three days a year. Black was employed abroad in engineering and construction management jobs from 1974 through 1980.
When Black was in the United States, he would call Pyne, who always made the children available for visitation. She even drove the children out of state to meet him. Black testified they worked out a "free-flowing" visitation arrangement, and Pyne had always been cooperative. The parties' dissolution decree did not specify any scheduled or specific visitation rights for Black.
The first time (and frankly, the only time) the parties experienced problems with visitation was at Thanksgiving and Christmas in 1980. Black had left his international employment and had recently returned to live in Marion County near where Pyne and the *1079 children were living. He asked to visit with the girls on Thanksgiving, but he admitted this request had been "late." He also more timely asked for visitation at Christmas time, but Pyne said they had made other plans. During that December, he did take Allison out for dinner and an evening.
Black consulted an attorney who wrote Pyne a letter demanding that she agree to a formal schedule of visitation with the girls. Black's proposed scheduled visitation was not out of the ordinary, when compared with generic dissolution decrees. However, because Black had never exercised even one small fraction of such quantum of visitation rights in the past, his request produced alarm and upset to Pyne, her new husband, and the children.
The girls said they did not want to see Black at all. Rhonda, then sixteen years old, was in counselling and therapy. She had been diagnosed as having agoraphobia.[8] Pyne testified Rhonda refused to leave her home and her room. Although very bright in school, at that point in her life, Rhonda was having difficulties coping with everyday living. She was afraid of Black and thought he had been abusive to her.
Allison, then twelve years old, felt Black had rejected her and she resented him. Pyne said she offered Allison therapy and counselling to help her reconcile with Black, but Allison refused. Pyne admitted she felt she should not force the girls to visit with Black against their will, and did not do so.
Pyne and her new husband also consulted an attorney. Their attorney replied to Black's attorney in February of 1981. The attorney said he could offer no encouragement that Pyne would voluntarily agree to Black's proposed visitation schedule outlined in the letter to Pyne. He explained the children did not want such visitation; Pyne feared the children would suffer serious physical, mental and emotional upset if the proposed visitation went forward; and he noted Black's prior indifference to the children, lack of substantial prior visitation, and Black's previous failure to meet court-ordered responsibilities for the children. However, Pyne's attorney offered to discuss these matters further at Black's attorney's convenience.
The clear inference from Black's attorney's letter was if Pyne did not agree to the proposed visitation schedule, that Black would petition the court to establish set visitation rights. However, he did not do so. After February of 1981, Black never asked Pyne for visitation with the girls on a formal or informal basis. No one followed up Pyne's attorney's offer to discuss visitation further. Nothing else ever happened regarding visitation.
Based on these undisputed facts, the trial court faulted Pyne for "not making even the slightest effort to encourage contact between the children and their father," following the 1980 holidays. He said "her refusal to foster and encourage a relationship between the children and their father is graphically illustrated by the children's Christmas gifts from their father in 1980, which have remained in her attic for almost twelve years, unopened."
The only testimony in this record concerning unopened Christmas gifts came from Pyne. She testified that in 1980 when the girls received the gifts and cards from Black, they refused to open them. At that time, they were upset with Black because of his proposed visitation. Rhonda thought her father had been physically abusive to her in the past, and Allison thought he had rejected her. Pyne saved the unopened gifts for the girls, thinking someday they would reconcile with Black. She said she still had the gifts stored in her garage.
The Florida cases in which child support arrearages were denied to a custodial parent because visitation had been restricted or cut off are much more extreme than the facts in this case. In those cases, the custodial parent hid the children from the other, or completely *1080 barred any contact with them. And in all such cases, the custodial parent refused (sometimes repeatedly) to abide by specific court-ordered visitation rights.[9]
Nothing comparable happened in this case. There were no specific court-ordered visitation rights. After the 1980 visitation problems arose, Black could have gone to court to obtain such rights, but he chose not to do so. Pyne and the girls continued to live in the same residence as they had before 1980, near Black, and he knew where they were at all times.
It cannot accurately be said that Pyne denied Black visitation with the girls, because he asked for none after February 1981. Nor can it be said that Pyne barred any contact between them, because Black admitted he made no effort to contact them directly or through Pyne. The most Pyne can be faulted for is not making more of an effort to heal the estranged relationship between the children and their father, after 1981. This, however, is not a denial of visitation rights.

LACHES
The trial court correctly ruled that delay alone was not a legally sufficient basis to refuse to enforce child support arrearages.[10] But it found Pyne's explanation for not having filed suit earlier inadequate. Pyne testified she was afraid of Black because he had been "abusive" to her in the past.
However, the trial court found Black had suffered prejudice because he gave up his father-daughter relationship, and in any event, Pyne did not support the children "beyond her own legal responsibility." The first finding will be discussed below in connection with estoppel. The second does not necessarily relate to laches, nor does it appear a proper defense to this proceeding.
The record clearly establishes that Pyne and her second husband fully supported Rhonda and Allison, through the time each turned eighteen years of age and well beyond twenty-one years, when they attended college. Prior to their attaining eighteen years of age, Pyne supplied the girls' support and needs at a level consistent with a comfortable life-style. This included some travel abroad, a few years in private schools, and extensive psychological therapy for Rhonda. Black did not dispute Pyne spent funds for the girls' support, which would not have been necessary had he been paying the child support decreed by the court.
Thus, there is no basis in this record for the trial judge's conclusion that Pyne failed to prove she provided support for the girls "beyond her own legal responsibility." Her proof in this regard is sufficient to support recovery of child support arrearages. See O'Brien v. O'Brien, 424 So.2d 970 (Fla. 3d DCA 1983). The fact that Pyne or others provided adequate support for the children is not a legal defense to child support obligations. Phillips v. Adams, 339 So.2d 665 (Fla. 4th DCA 1976). Nor must the custodial parent prove he or she suffered a hardship caused by not receiving child support from the obligated parent. As the Florida Supreme Court said in Gibson: "Upon the child reaching eighteen, the custodial parent is not magically reimbursed for personal funds spent nor debts incurred due to nonpayment of child support." 561 So.2d at 572.

IV. ESTOPPEL/ACQUIESCENCE

Estoppel/acquiescence has been recognized as a possible defense to a suit for child support arrearages, if the child's welfare is not jeopardized; for example, in cases where the child has attained its majority by the time of suit. See Van Meter v. Kelsey, 91 So.2d 327 (Fla. 1956); Parrish v. Department of Health and Rehabilitative Services, 525 So.2d 1029 (Fla. 5th DCA 1988); Brock v. Hudson, 494 So.2d 285 (Fla. 1st DCA 1986). But all courts writing about estoppel in this context stress that the circumstances must be extreme and compelling. To hold otherwise would undermine Florida's established *1081 policy of upholding and enforcing child support obligations.
The trial court found as its primary basis for estoppel in this case, an "unspoken agreement" not to go to court to litigate child support and visitation, and to mutually surrender any rights in these regards. The court found:
Based on his advice [Pyne's attorney] she [Pyne] made an informed and voluntary decision to forego her right to child support because the former husband would have insisted on his right to visitation with the children. Neither party asserted their rights in court, each relying on the other's unspoken agreement to not litigate these issues.
The record below is undisputed that Black and Pyne had no communication with one another, oral or written, personally or through their attorneys, regarding any of these matters. Black simply stopped paying any child support and Pyne elected not to sue him to enforce his obligations. Black ceased asking Pyne for visitation with the children, although he later made indirect contact through relatives, but was rejected by the children. There is no showing that the conduct of one was the quid pro quo for the conduct of the other.
This "contract" does not rise to the level of being conscious or intentional. If a contract can be said to have resulted from pure conduct, its terms are not provable until after it has been performed. Although such conduct may establish "acquiescence" it falls short of an express contract. See Brown v. Brown, 108 So.2d 492 (Fla. 2d DCA 1959).
The lack of any express understanding or agreement between Pyne and Black distinguishes this case from McClish v. Lee, 633 So.2d 56 (Fla. 5th DCA), rev. denied, 640 So.2d 1107 (Fla. 1994); Brock, Robinson v. Department of Health and Rehabilitative Services, 473 So.2d 228 (Fla. 5th DCA 1985); Armour v. Allen, 377 So.2d 798 (Fla. 1st DCA 1979); Wing v. Wing, 464 So.2d 1342 (Fla. 1st DCA 1985). In all of those cases, the parties made a bargain to surrender visitation rights for support rights, and the obligated party relied upon the bargain to that party's detriment. In McClish, this court stressed that the former wife was bound by her express contract. And, in Robinson, this court stressed that the former wife did more than acquiesce in the former husband's failure to pay, she expressly agreed he could discontinue the child support payments.
An additional element lacking in this case is a showing that Black was prejudiced by Pyne's delay in seeking enforcement. He did cease trying to establish a relationship with his daughters. But at the time he ceased trying, their relationships were very strained, and to recoup them, would have required great patience and understanding on his part.
Further, Black made no showing that Pyne's delay in seeking enforcement compromised him financially. See Brumby; Jimenez. In Brown v. Brown, 108 So.2d 492 (Fla. 2d DCA 1959), the former husband took his children into his business and gave them an interest in it; he remarried; had more children to support; and he ultimately disposed of his business and planned his retirement with the understanding and belief that he would not be required to pay accrued unpaid child support and alimony. Similarly, in Armour v. Allen, the former husband proved he had changed his life-style and incurred debts for which he would not have otherwise obligated himself were it not for the parties' express agreement to forego child support in exchange for no visitation with the parties' child.
In this case, the record showed Black enjoyed a comfortable life-style after 1980. He was not in debt, and had acquired substantial assets through cash purchases. For example, after he stopped paying child support, he bought a seventy-eight acre farm for which he paid at least $250,000 in cash, and a lot in North Carolina for which he paid $29,000. He also has $55,000 in investment funds.
In more recent years, Black put all of his property in living trusts, and deeded the farm to the Florida Sheriff's Youth Foundation, Inc., retaining only a life estate interest in it. He testified he did this because he had no children, and he "wanted to." These kinds of transactions do not indicate reliance *1082 on a belief that he would never be called upon to pay a child support arrearage judgment. Quite the contrary.
Although Pyne delayed a long time in bringing this suit, Black can also be faulted for failing to seek to modify his child support obligations decreed by the court. The public policy of this state favors putting the burden on the obligated party to seek a court ordered modification of a decree, rather than unilaterally acting to change it by noncompliance.[11] As Judge Hendry wrote in Newman v. Newman, 459 So.2d 1129 (Fla. 3d DCA 1984), rev. denied, 466 So.2d 218 (Fla. 1985):
There has been no prejudice or disadvantage caused to appellee by the delay... . [citations omitted] Moreover, appellee is apparently guilty of `unclean hands' in this matter for having failed to comply with his court-ordered child support obligation or to seek modification thereof, and therefore is not entitled to assert the defense of laches against the appellant's petition.
Newman, 459 So.2d at 1131.
In summary, there appears to be a nearly equal amount of blame attributable to both parties for not seeking a court remedy earlier, and for not trying to rebuild Black's relationship with his daughters. To grow up healthy, children need the emotional and psychological support of both parents. From the record it appears they were both damaged in this regard.
Although Black failed to marshal sufficient proof of estoppel, acquiescence and laches,[12] he did produce sufficient equities on his side to justify the trial court's refusal to enforce the arrearage by means of contempt. However, I would award Pyne an arrearage judgment for those sums that accrued prior to the children attaining their respective eighteen-year-old birthdays.
NOTES
[1] See Cronebaugh v. Van Dyke, 415 So.2d 738 (Fla. 5th DCA 1982), review denied, 426 So.2d 25 (Fla. 1983).
[1] See Department of Health and Rehabilitative Services v. Holland, 602 So.2d 652 (Fla. 5th DCA 1992).
[2] The law on this issue is apparently different in the territory of the Fifth District Court of Appeal than in the territories of the other Florida District Courts of Appeal. See Stehmeyer v. Stehmeyer, 489 So.2d 863 (Fla. 1st DCA 1986) (allowed former wife to enforce post-majority child support obligation in settlement agreement which was incorporated in dissolution judgment); Brown v. Brown, 484 So.2d 1282 (Fla. 4th DCA 1986) (disapproving Cronebaugh and allowing former wife to enforce arrearage for accrued college expenses provided for in final judgment and settlement agreement incorporated therein); Nevman v. Newman, 459 So.2d 1129 (Fla. 3d DCA 1984), rev. denied, 466 So.2d 218 (Fla. 1985), Massey v. Massey, 443 So.2d 294 (Fla. 3d DCA 1983) (adopting the dissenting opinion in Cronebaugh v. Van Dyke, as that court's ruling) Holmes v. Holmes, 384 So.2d 1295 (Fla. 2d DCA 1980) (allowed former wife to enforce settlement agreement incorporated in final judgment of dissolution requiring former husband to pay college education expenses for parties' children).
[3] Gibson v. Bennett, 561 So.2d 565 (Fla. 1990).
[4] Gibson v. Bennett, 561 So.2d 565 (Fla. 1990); Ragan v. Thomas, 515 So.2d 405 (Fla. 1st DCA 1987); Hinton v. Reynolds, 442 So.2d 1111 (Fla. 4th DCA 1983); Johnson v. Johnson, 382 So.2d 427 (Fla. 3d DCA 1980), Smith v. Morgan, 379 So.2d 1052 (Fla. 1st DCA 1980); Patterson v. Patterson, 348 So.2d 592 (Fla. 1st DCA 1977).
[5] Pottinger v. Pottinger, 1333 Fla. 442, 182 So. 762 (1938); Puglia v. Puglia, 600 So.2d 484 (Fla. 3d DCA 1992); Larger v. Diaz, 595 So.2d 1092 (Fla. 3d DCA 1992); Bingemann v. Bingemann, 551 So.2d 1228 (Fla. 1st DCA 1989), rev. denied, 560 So.2d 232 (Fla. 1990); Raybuck v. Raybuck, 451 So.2d 540 (Fla. 2d DCA 1984).
[6] See, e.g., Panganiban v. Panganiban, 396 So.2d 1156 (Fla. 2d DCA 1981); Phillips v. Adams, 339 So.2d 665 (Fla. 4th DCA 1976); Denton v. Denton, 147 So.2d 545 (Fla. 2d DCA 1962).
[7] See Yandell v. Yandell, 39 So.2d 554 (Fla. 1949); Howard v. Howard, 143 So.2d 502 (Fla. 3d DCA 1962).
[8] This is defined as a:

[f]ear of being in a large open space; overwhelming and incapacitating anxiety on traveling away from the safety of home or on being in crowded places.
Dorland's Illustrated Medical Dictionary (26th ed) at 41.
[9] Compare Craig v. Craig, 157 Fla. 710, 26 So.2d 881 (Fla. 1946); Panganiban v. Panganiban, 396 So.2d 1156 (Fla. 2d DCA 1981); Warrick v. Hender, 198 So.2d 348 (Fla. 4th DCA 1967); Denton v. Denton, 147 So.2d 545 (Fla. 2d DCA 1962).
[10] See Brumby v. Brumby, 647 So.2d 330 (Fla. 4th DCA 1994); Cartee v. Carswell, 425 So.2d 204 (Fla. 5th DCA 1983); Jimenez v. Jimenez, 309 So.2d 38 (Fla. 3d DCA 1975).
[11] Kutz v. Fankhanel, 608 So.2d 873, 877 (Fla. 5th DCA 1992); Parrish v. Department of Health and Rehabilitative Services, 525 So.2d 1029 (Fla. 5th DCA 1988); Bloom v. Bloom, 414 So.2d 1153 (Fla. 3d DCA 1982); Melvin v. Melvin, 391 So.2d 691 (Fla. 1st DCA 1980), rev. denied, 399 So.2d 1144 (Fla. 1981); Arnnour v. Allen, 377 So.2d 798 (Fla. 1st DCA 1979). See also § 61.14(6)(a)3.
[12] See Brock v. Hudson, 494 So.2d 285 (Fla. 1st DCA 1986).